Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EMELISA BERMÚDEZ RIVERA HOGAR LAS ÁGUILAS, INC.  **Recurrente**  v.  DEPARTAMENTO DE LA FAMILIA  **Recurrida** | KLRA202300665 | *Revisión Judicial* procedente de la Junta Adjudicativa, Departamento de la Familia, Oficina Regional de Ponce  Apelación Núm.: 2022 PPSF 00126  Sobre: Maltrato Institucional Adultos con Fundamento |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio, el Juez Marrero Guerrero y la Jueza Boria Vizcarrondo.

Pagán Ocasio, juez ponente

## SENTENCIA

En San Juan, Puerto Rico, a 27 de marzo de 2025.

### I.

El 28 de diciembre de 2023, el Hogar Las Águilas, Inc. (Hogar) y la señora Emelisa Bermúdez Rivera (señora Bermúdez Rivera) (en conjunto, parte recurrente) presentaron una *Solicitud de Revisión Judicial* en la que solicitaron que revoquemos una *Resolución* emitida por la Junta Adjudicativa del Departamento de la Familia (Junta) el 31 de octubre de 2023, notificada y archivada en autos ese mismo día.[1] En su dictamen, la Junta confirmó la *Notificación al Operador sobre Resultado de Investigación de Maltrato en Establecimientos para Adultos* emitida el 18 de mayo de 2022 por la Unidad de Maltrato Institucional de Establecimientos de Adultos

---

[1] Apéndice del recurso de revisión judicial, Anejo 3, págs. 90-92.

Número Identificador
SEN2025_____

(UMIA), Oficina Regional de Ponce, de la Administración de Familias y Niños (ADFAN) del Departamento de la Familia.[2]

Por medio de dicha notificación, la UMIA determinó que, como resultado de la investigación sobre el alegado maltrato correspondiente a los referidos números 10343404, 10385988, 10386496 y 10387101, se encontró el mismo "Con Fundamento". Cabe destacar, además, que el 18 de mayo de 2022, la referida Oficina Regional le remitió a la señora Bermúdez Rivera una carta donde denegó la solicitud de renovación de licencia para la operación del Hogar por incumplimiento con los requisitos de la *Ley de Establecimientos para Personas de Edad Avanzada*, Ley Núm. 94 del 22 de junio de 1977 (Ley Núm. 94-1977), según enmendada, 8 LPRA secs. 351 *et seq.*; y el *Reglamento para el Licenciamiento y Supervisión de Establecimientos para el Cuidado de Personas de Edad Avanzada*, Reglamento Núm. 7349, Departamento de la Familia, 7 de mayo de 2007 (Reglamento Núm. 7349-2007).[3] Dicha determinación fue basada en los hallazgos y las recomendaciones de la UMIA, particularmente el cierre del establecimiento, luego de encontrar "Con Fundamento" las aludidas querellas de maltrato y negligencia.

El 12 de enero de 2024, emitimos una *Resolución* en la que le concedimos a la parte recurrente cinco (5) días, a partir de la notificación de esa *Resolución*, para informar si se proponía reproducir la prueba oral.

El 22 de enero de 2024, la parte recurrente presentó una *Moción en Cumplimiento de Orden* en la cual informó estar en proceso de reproducir la prueba oral.

El 24 de enero de 2024, emitimos una *Resolución* donde autorizamos la presentación de la transcripción de la prueba oral

---

[2] *Íd.*, Anejo 1, pág. 19.
[3] *Íd.*, págs. 17-18.

(TPO) como método de reproducción de la prueba oral. Además, calendarizamos el trámite apelativo a seguir y les concedimos a las partes varios términos y directrices sobre el manejo de la TPO.

El 5 de marzo de 2024, en vista de que transcurrió el término concedido a través de la *Resolución* emitida el 24 de enero de 2024 para que las partes realizaran esfuerzos razonables para lograr una TPO y someter una moción conjunta con dichos esfuerzos, emitimos una *Resolución* donde le concedimos a la parte recurrente un término de tres (3) días, contados a partir de la notificación de dicha *Resolución,* para informar el estado de TPO.

El 8 de marzo de 2024, la parte recurrente radicó una *Moción en Cumplimiento de Orden y Solicitud de Término Adicional.*

El 12 de marzo de 2024, emitimos una *Resolución* en la que concedimos un término final para presentar la aludida moción conjunta; a saber, hasta el 16 de abril de 2024.

El 12 de abril de 2024, la parte recurrida, representada por la Oficina del Procurador General de Puerto Rico (Procurador General), presentó una *Moción Informativa y Solicitud de Remedio* donde sostuvo que ninguna de las resoluciones emitidas por este Tribunal fue recibida por la Oficina del Procurador General. Ante ello, solicitó que les ordenáramos a las partes a notificarle sus escritos a la Oficina del Procurador General y en lo sucesivo, que se le notificara toda orden y resolución emitida en el caso de marras.

El 16 de abril de 2024, emitimos una *Resolución* mediante la cual ordenamos a las partes y a la secretaría de este tribunal a notificar sus escritos y documentos conforme a derecho.

Ese mismo día, la parte recurrente presentó una *Moción en Cumplimiento de Orden* por la cual solicitó un término de cuarenta y cinco (45) días para presentar de forma final una moción conjunta en torno a la TPO estipulada.

Ante ello, el 17 de abril de 2024, emitimos una *Resolución* donde les concedimos a las partes hasta el 7 de junio de 2024 para presentar la aludida moción conjunta.

El 7 de junio de 2024, las partes presentaron una *Moción Conjunta en Cumplimiento de Orden y Solicitando Autorización para Presentación de Archivo en Formato Digital*. Mediante esta, y en lo pertinente, las partes informaron haber estipulado la TPO y solicitaron de este Tribunal que se les permitiera la presentación de la misma como archivo digital.

El 10 de junio de 2024, emitimos una *Resolución* en la que acogimos la TPO sometida y le concedimos a la parte recurrida un término de treinta (30) días, a partir de la notificación de dicha *Resolución*, para someter su alegato en oposición al recurso.

Al siguiente día, la parte recurrente presentó una *Moción presentando "Tomo II" corregido de la transcripción y solicitando autorización para presentar Alegato Suplementario*. Por medio de esta, informó que se incluyó por error una versión del Tomo II de la TPO, donde en varias páginas identificaban a la Oficial Examinadora, Lcda. Olga Rosas, como Juez Carmen Montalvo.

El 14 de junio de 2024, emitimos una *Resolución* en la que denegamos la presentación del alegato suplementario, a tenor con la Parte VII, la Regla 63 y la Regla 66 del Reglamento de Apelaciones, 4 LPRA Ap. XXII-B, R. 63 y R. 66.[4]

Después de varias solicitudes de prórrogas y la concesión de los términos correspondientes, el 6 de septiembre de 2024, la parte recurrida, representada por el Procurador General, radicó un *Alegato del Departamento de la Familia*.

---

[4] El Juez Sánchez Ramos hubiese declarado "Con Lugar" la petición de la parte recurrente.

El 13 de septiembre de 2024, la parte recurrente radicó una *Moción reiterando solicitud de autorización para presentación de Alegato Suplementario por la Parte Recurrente.*

El 17 de septiembre de 2024, emitimos una *Resolución* por la cual, vía excepción, le concedimos a la parte recurrente un término de quince (15) días, a partir de la notificación de dicha *Resolución,* para presentar su alegato suplementario.

Luego de una solicitud de prórroga y la concesión del término correspondiente, el 21 de octubre de 2024, la parte recurrente presentó un *Alegato Suplementario de la Parte Peticionaria* por el que señaló las porciones de la TPO que, según ella, apoyan sus señalamientos de error.

El 22 de octubre de 2024, emitimos una *Resolución* donde le concedimos a la parte recurrida hasta el 6 de diciembre de 2024 para presentar su alegato de réplica.

El 6 de diciembre de 2024, la parte recurrida radicó una *Solicitud de autorización para presentar escrito en exceso del límite reglamentario de páginas* y un *Escrito en cumplimiento de Resolución* mediante la cual la parte recurrida argumentó que ciertas porciones de la TPO sustentaban la corrección de la decisión recurrida y solicitó que sea confirmara la misma.

Cumplidas nuestras resoluciones y contando con el beneficio de la comparecencia de ambas partes, damos por perfeccionado el recurso de epígrafe, y en adelante pormenorizaremos los hechos procesales atinentes al recurso de revisión judicial.

**II.**

El caso de marras tiene su génesis el 12 de julio de 2021 cuando un informante realizó un referido bajo el número 10343404.[5] Alegó el informante que el Hogar estaba incurriendo en

---

[5] Apéndice del recurso de revisión judicial, Anejo 8, págs. 119-120.

una serie de alegadas prácticas ilegales respecto a la administración de medicamentos, el cuidado médico, la falta de atención brindada a los residentes del Hogar y las muertes de varios residentes de dicha institución. Se alegó que el Hogar tenía alrededor de 34 residentes y que la mayoría son víctimas de algún tipo de maltrato o negligencia por parte del personal.

Posteriormente, el 25 de octubre de 2021, la señora Ivonne Alicea Rodríguez (señora Alicea Rodríguez), con la compañía de la señora Irizarry de Jesús, ambas trabajadoras sociales de la UMIA, realizaron una visita e inspección ocular en el Hogar con el propósito de investigar el referido número 10343404.[6] Tanto la directora del Hogar, la señora Tania Rivera, como la dueña y presidenta del Hogar, la señora Bermúdez Rivera, negaron las alegaciones aludidas.

De dicha visita, la UMIA realizó varios hallazgos incluyendo que la empleada de la cocina, la señora Ivette Santiago, y la ayudante de la cocina, la señora Iris Soto, no contaban con el curso de inocuidad; el menú certificado estaba vencido; no confeccionaron los alimentos conforme al ciclo del menú presentado; el menú no estaba escrito en la pizarra; no contaban con una enfermera graduada que cumpliese con la colegiación de enfermería y que estuviese presente 20 horas semanales; el registro de medicamentos no era confiable; había falta de higiene en el baño de caballeros; tenían certificados de salud vencidos; y los expedientes médicos, sociales y de personal estaban incompletos, entre otros hallazgos.

El 21 de diciembre de 2021, la UMIA realizó una visita de seguimiento y como resultado preparó un *Informe de Visita al Establecimiento*.[7] Entre los hallazgos encontrados está que el Hogar

---

[6] *Íd.*, págs. 129-132.
[7] *Íd.*, págs. 136-137; Apéndice del Alegato del Departamento de la Familia, Anejo I, págs. 1-2.

no confeccionó los alimentos por el ciclo del menú; ofreció alimentos altos en sodio, azúcares y grasas; el menú no constaba en la pizarra; el registro de los medicamentos no estaba actualizado; la licencia para operar estaba vencida desde el 10 de diciembre de 2021; la señora Tania Rivera cesó sus funciones como directora del Hogar el 15 de diciembre de 2021; y los expedientes sociales estaban incompletos, entre otros hallazgos.

El 11 de febrero de 2022, el Hogar presentó ante la Oficina de Licenciamiento del Departamento de la Familia una *Solicitud de Renovación* de licencia.[8]

El 7 de marzo de 2022, la UMIA emitió un *Informe de Visita al Establecimiento* en seguimiento al primer referido número 10343404.[9] Entre los hallazgos alcanzados se encuentran que (1) el menú escrito no coincidió con el ciclo del menú; (2) no cocinaron según el ciclo de menú indicado; (3) el ciclo de menú no incluyó mes ni semana; (4) el Hogar tenía su licencia para operar vencida; e (5) incumplieron con incluir en el libro de incidentes todos los incidentes que ocurrieron en el establecimiento, no contaba con un(a) director(a).  En relación al menú y los alimentos servidos se hizo constar que era la tercera ocasión que se realizaban idénticos señalamientos y que la dueña del establecimiento no muestra interés en cumplir con lo requerido. Además, la UMIA recomendó que movieran al empleado de refuerzo para cubrir las áreas donde hubiesen más de seis (6) participantes.

Según el segundo referido bajo el número 10385988, fechado el 25 de marzo de 2022, el informante alegó que el Hogar les quitó medicamentos a los ancianos sin autorización médica; al informante le preocupó la muerte de más de seis (6) envejecientes en menos de

---

[8] Apéndice del recurso de revisión judicial, Anejo 24, pág. 350 (se toma conocimiento judicial de este hecho procesal).
[9] *Íd.*, Anejo 8, págs. 136-142; *Íd.*, Anejo 23, págs. 290-293.

seis (6) meses; le quitaron medicamentos de la presión; habían medicamentos vencidos y no le brindaron alimentos correctos para su edad; una residente tenía una cadera fracturada y no la quisieron llevar al hospital; tenían a las personas amarradas todo el tiempo con unos pecherines o cinturones, sin autorización médica; les gritaban y una residente falleció porque no la quisieron llevar al hospital.[10]

A tenor con el tercer referido número 10386496, del 28 de marzo de 2022, un informante alegó que durante un fin de semana ocurrieron dos (2) muertes repentinas por no contar con personal suficiente; les brindaron alimentos inapropiados; la supervisora Lymarie Torres Soto (señora Torres Soto) les quitó medicamentos a los envejecientes o no se distribuyeron en la hora adecuada; se cayeron cinco (5) envejecientes y no supieron transferirlos a otra cama o no estuvieron pendientes por si deambulaban; tres (3) envejecientes presentaron daños físicos o tuvieron que ser admitidos a algún hospital; cuando se cayeron no se lo divulgaron a los familiares o no recibieron atención médica inmediata para descartar fractura alguna.[11]

Bajo el cuarto referido del 31 de marzo de 2022 y con el número 10387101, el informante y médico de una envejeciente de aproximadamente noventa años indicó que luego de esta vomitar el jueves, 24 de marzo de 2022, no la llevaron a sala de emergencia, ni recibió asistencia médica por lo cual, en la madrugada del viernes, 25 de marzo, falleció. Arguyó también que, siendo el médico de la dama, no lo llamaron hasta luego de catorce (14) horas del fallecimiento.[12]

---

[10] *Íd.*, Anejo 8, pág. 120.
[11] *Íd.*, págs. 120-121.
[12] *Íd.*, pág. 121.

El mismo 31 de marzo de 2022, la UMIA visitó una vez más al Hogar, y posteriormente interpretaron los tres (3) referidos de maltrato[13].

El 6 de mayo de 2022, la UMIA emitió una *Hoja de Trámite* con relación al informe de investigación sobre el Hogar.[14] Mediante esta hoja, la UMIA le recomendó a la Unidad de Licenciamiento no renovar la licencia del Hogar vencida desde el 10 de diciembre de 2021 ya que, a raíz de la investigación realizada, se habían evidenciado serias negligencias en la supervisión por falta de personal, atención a la salud y no les proveyeron a los cuidados más básicos como residentes de un establecimiento de cuidado por tiempo prolongado. La agencia administrativa determinó que dicha negligencia puso en riesgo la vida y la seguridad de la matrícula demostrando carencia de interés y capacidades protectoras al fallar en corregir los señalamientos y mejorar los servicios en aspectos relacionados directamente con la salud, la seguridad, y el bienestar físico y emocional de la matrícula servida. La seriedad de los hallazgos es de tal naturaleza que no pueden ser eximidos de responsabilidad por los mismos, concluyó el informe.

El 10 de mayo de 2022, la Secretaria del Departamento de la Familia emitió la *Orden Administrativa Núm. 2022-03* para que, a modo de excepción, se concediera una autorización especial al personal administrativo de los establecimientos dedicados al cuidado de adultos a ejercer funciones adicionales a las de su cargo, cuando las circunstancias así lo ameritaran, y siempre y cuando contaran con los requisitos y competencias para ejercerlas.[15] En lo pertinente, dispuso que:

> **TERCERO:** Se concederá autorización solo a los establecimientos que han mantenido un historial de cumplimiento satisfactorio en la Oficina de

---

[13] *Íd.,* págs. 142-157.
[14] *Íd.*, págs. 117-167.
[15] *Íd.*, Anejo 9, págs. 168-171.

Licenciamiento, que no tengan antecedentes de maltrato/negligencia y que no se encuentren bajo investigación por parte de la ADFAN, Oficina de Licenciamiento y/o alguna agencia de ley y orden. Los establecimientos cobijados bajo esta Orden deben tener su licencia vigente.

Sin embargo, en aquellos casos que durante el periodo de vigencia de esta Orden se determine que existe un riesgo inminente de maltrato institucional y/o una situación que represente un peligro para la vida o seguridad de los participantes, la Oficina de Licenciamiento podrá tomar las medidas necesarias dirigidas a cumplir con el deber ministerial de brindar protección a los participantes aun estando vigente el periodo establecido en esta Orden.

. . . .[16]

El 18 de mayo de 2022, la UMIA emitió una *Notificación al Operador sobre Resultado de Investigación de Maltrato en Establecimientos para Adultos* por la cual informó haber encontrado "Con Fundamento" el maltrato alegado en los referidos #10343404, #10385988, #10386496 y #10387101, luego de realizar una investigación.[17]

Ese mismo día, el Director Regional de Ponce, el señor Pedro J. Cortés Acevedo, del Departamento de la Familia le cursó una carta a la señora Bermúdez Rivera. Mediante la misma, le informó la denegatoria de la solicitud de renovación de licencia radicada el 11 de febrero de 2022 con el propósito de operar el Hogar ante el incumplimiento con la Ley Núm. 94-1977, *supra,* y el Reglamento Núm. 7349-2007, *supra.*[18] Expresó que el motivo de la aludida denegatoria estuvo basado en los hallazgos y recomendaciones de la UMIA, particularmente en el cierre del establecimiento por investigación que se encontró con fundamento por querellas de maltrato y negligencia, conforme al Artículo 5 de la Ley Núm. 94-1977, *supra,* sec. 355; y los incisos (c-5) y (d) del Artículo XX, Sección 20.1, del Reglamento Núm. 7349-2007, *supra,* pág. 29.

---

[16] *Íd.,* págs. 169-170.
[17] *Íd.,* Anejo 1, pág. 19.
[18] *Íd.,* págs. 17-18.

Inconforme con la determinación, el 2 de junio de 2022, la parte recurrente presentó una *Apelación* ante la Junta Adjudicativa del Departamento de la Familia.[19] Por medio de esta, solicitó que se dejara sin efecto la decisión emitida por la UMIA el 18 de mayo de 2022 donde determinó que las querellas sobre maltrato eran "Con Fundamento", y que, consecuentemente, ordenara la renovación de la licencia de operación del Hogar, contrario a la decisión del Director Regional emitida el mismo día. Además, arguyó que no procedía la orden de cierre inmediato de la institución porque no estaba contemplado en el Artículo 13 de la Ley Núm. 94-1977, *supra*, sec. 363.

Además de la apelación a nivel administrativo, el 15 de julio de 2022, el Hogar presentó una *Demanda* de *injunction* preliminar y permanente en contra del Departamento de la Familia ante el TPI, Sala Superior de Ponce, en el caso PO2022CV01929.[20] Con relación a las determinaciones de la UMIA y el Director Regional, reclamó una violación a su debido proceso de ley arguyendo que la agencia administrativa ordenó el cierre del establecimiento sin escuchar al Hogar previamente.

Por su parte, el 3 de agosto de 2022, el Departamento de la Familia presentó una *Demanda* de entredicho provisional e *injunction* preliminar y permanente, bajo el Artículo 14 de la Ley Núm. 94-1977, *supra*, sec. 364, ante el foro primario en el caso PO2022CV02093 en contra del Hogar, la señora Bermúdez Rivera como representante del Hogar y a la señora Kammy Negrón López como representante de dicha institución.[21] Mediante esta, solicitó el cese y desista de la operación del Hogar por no contar con una

---

[19] *Íd.*, págs. 1-24.
[20] Véase el Sistema Unificado para el Manejo y Administración de Casos (SUMAC), Entrada Núm. 1 (se toma conocimiento judicial de este hecho procesal), PO2022CV01929.
[21] *Íd.* (se toma conocimiento judicial de este hecho procesal), PO2022CV02093.

licencia de establecimiento para el cuidado de personas de edad avanzada, según requerido por la Ley Núm. 94-1977, *supra*.

Luego de consolidar ambos pleitos, el 8 de diciembre de 2022, el TPI emitió una *Sentencia*, notificada y archivada en autos ese mismo día, denegando el *injunction* solicitado por el Departamento de la Familia y declaró con lugar la petición de *injunction* preliminar y permanente realizada por la parte recurrente.[22] Mediante el dictamen, el foro primario expresó que:

> …[C]oncluimos que el Departamento de la Familia violó la garantía del debido proceso de ley del Hogar Las Águilas, en tanto la notificación realizada y conforme a la cual exige el cierre inmediato, es inadecuada por no colocar al establecimiento en posición de defenderse de manera previa a que su interés propietario se vea afectado. A la luz de los criterios establecidos por [la] ley y la jurisprudencia, procede el remedio interdictal solicitado por Hogar Las Águilas.[23]

Asimismo, el foro primario ordenó al Departamento de la Familia a garantizar el debido proceso de ley del Hogar con todas las notificaciones; y le impuso a dicha institución supervisión constante y monitoreo a los fines de garantizar el cumplimiento de los estándares regulatorios aplicables al servicio allí brindado.

Ante tal determinación, se celebraron vistas administrativas ante la Junta los días 9, 14 al 16 de febrero de 2023; 20, 21, 23 y 24 de marzo de 2023; y 17 de julio de 2023.

Durante las vitas adjudicativas, testificaron empleados del Hogar, personal de la UMIA, trabajadores sociales y doctoras; a saber, la señora Lymarie Torres Soto (Enfermera Generalista del Hogar);[24] la señora Kammy Ángeles Negrón López (Directora de Operaciones y Administración del Hogar);[25] la señora Emelisa Bermúdez Rivera (Dueña y Presidenta del Hogar);[26] la señora

---

[22] Apéndice del recurso de revisión judicial, Anejo 24, pág. 294-353.
[23] *Íd.*, pág. 345.
[24] TPO del 9 de febrero de 2023, pág. 25, líneas 14-19 (Tomo I).
[25] TPO del 15 de febrero de 2023, pág. 758, líneas 18-19 (Tomo III); pág. 759, líneas 1-2.
[26] *Íd.*, pág. 1,252, líneas 9-12 (Tomo V).

Lugelina Rodríguez Barral (doctora retirada; su mamá residió en el Hogar);[27] la señora María de Lourdes Torres Hernández (Supervisora de Trabajo Social I de la UMIA);[28] la doctora Sonia Ivette Santiago Mateo (Doctora Especialista en Medicina Interna con certificaciones en cuidado de heridas, linfedemas y geriatría);[29] la señora Ivonne Alicea Rodríguez (Investigadora de la UMIA);[30] la señora Milagros Irizarry de Jesús (Trabajadora Social);[31] y la doctora Leila Vanessa Malavé Félix (Pediatra Intensivista, Doctora en Medicina Integrativa, y Perita del Departamento de la Familia).[32]

En adelante enumeramos las determinaciones de la Oficial Examinadora, la licenciada Olga B. Rosas Vélez, que la parte recurrente impugnó y resumimos los testimonios pertinentes de la TPO:

> **…"[S]e corroboró que en ocasiones se obviaba el suministro de dosis de medicamentos sin hablar directamente con el médico y pedir autorización, como lo fue el caso de Alejandro Mandry. Indistintamente el señor Mandry se hubiera descompensado en el HLA o en la oficina médica, todo esto fue directamente relacionado y/o causado a que se obvió el medicamento por meses y sin prueba en el expediente sobre las gestiones con los familiares y/o diálogo con el médico primario y razones para omitir el medicamento o medicamentos".[33]**

**Testimonio de la doctora Sonia Ivette Santiago Mateo**

La doctora Santiago Mateo sostuvo que era especialista en Medicina Interna y ostentaba certificaciones en cuidado de heridas, linfedemas y geriatría.[34] Con relación al caso de epígrafe, expresó que fue contratada para evaluar los documentos incluyendo las

---

[27] TPO del 16 de febrero de 2023, pág. 1,621, líneas 15-16; pág. 1,622, línea 16; pág. 1623, línea 1; pág. 1626, líneas 17-19; pág. 1627, línea 1.
[28] TPO del 20 de marzo de 2023, pág. 1,704, línea 3; pág. 1,705, líneas 1-9.
[29] TPO del 21 de marzo de 2023, pág. 2,037, líneas 16-19 (Tomo VII).
[30] TPO del 23 de marzo de 2023, pág. 2,422, líneas 15-17 (Tomo IX); pág. 2,423, líneas 1-13; pág. 2,424, líneas 1-7.
[31] TPO del 24 de marzo de 2023, pág. 2,709, líneas 16-19 (Tomo X); pág. 2,710, línea 1.
[32] TPO del 17 de julio de 2023, pág. 13, líneas 15-22.
[33] Apéndice del recurso de revisión judicial, Anejo 2, pág. 83; véase además, Recurso de revisión judicial, pág. 20.
[34] TPO del 21 de marzo de 2023, pág. 2,037, líneas 16-19 (Tomo VII).

notificaciones del Departamento de la Familia y los expedientes de los residentes.[35] A esos efectos, también se reunió con la señora Bermúdez Rivera y la señora Negrón López para aclarar dudas; y evaluó algunos residentes del Hogar.

Respecto al señor Alejandro Mandry, indicó que él tenía 90 años y padecía de hipertensión, depresión mayor, ansiedad e insuficiencia renal en la etapa III.[36] Sostuvo además que, según el Departamento de la Familia, el medicamento de ansiedad que le recetaron al señor Mandry llamado Risperdal se le estaba omitiendo, y que el mismo era un antipsicótico que se les administraba a pacientes de salud mental.[37]

**Testimonio de la señora Lymarie Torres Soto**

La señora Torres Soto alegó que desde el 2020 ejercía el puesto de Enfermera Generalista Graduada y que a partir del 16 de octubre de 2021 comenzó a trabajar como Supervisora en el Hogar.[38] Como enfermera, indicó que tenía que proveerles a los pacientes cuidado y tratamiento o medicamentos según órdenes médicas. Bajo el puesto de supervisora, estuvo encargada de supervisar a las enfermeras asociadas contratadas como cuidadoras.[39] Sin embargo, aclaró que, al momento de la presentación de las querellas, ella era cuidadora.[40]

Al igual que la doctora Santiago Mateo, la señora Torres Soto declaró que el señor Alejandro Mandry era hipertenso. Testificó que ella misma tomó la determinación de no darle a este el medicamento de la presión sin consultarlo con el doctor, y admitió que ella no podía tomar esa determinación.[41]

---

[35] *Íd.*, pág. 2,100, líneas 6-19 (Tomo VIII); pág. 2,101, líneas 1-2.
[36] *Íd.*, pág. 2,243, líneas 8-14; pág. 2,245, línea 6.
[37] *Íd.*, pág. 2,245, líneas 6-15.
[38] TPO del 9 de febrero de 2023, pág. 56, líneas 5-14 (Tomo I).
[39] TPO del 14 de febrero de 2023, pág. 353, líneas 11-14 (Tomo II); pág. 356, líneas 8-10; pág. 362, líneas 1-18.
[40] TPO del 9 de febrero de 2023, pág. 65, líneas 3-8 (Tomo I).
[41] TPO del 14 de febrero de 2023, pág. 721, líneas 9-19 (Tomo III); pág. 722, línea 1.

Por otro lado, declaró que, según la queja, no le administró al señor Mandry el medicamento Risperdal por varios meses, recetado para la ansiedad, y que tampoco conocía las consecuencias de no darle ese medicamento a pacientes psiquiátricos.[42] Indicó que se comunicó con la Farmacia Summit Hills para el despacho del medicamento, y esta le expresó que no podían despachar el mismo por haberse despachado en otra farmacia, Walgreens.[43]

Expuso la señora Torres Soto que, ante tal circunstancia, en repetidas ocasiones se comunicó con un familiar del señor Mandry, pero este no le contestó las llamadas ni los mensajes.[44] También arguyó que le explicó la anterior situación al doctor Jayson Vázquez, médico del señor Mandry, pero éste le expresó que no tenía control sobre si la farmacia despachaba los medicamentos.[45] Aun así, sostuvo la señora Torres Soto que no constaba en el expediente que por varios meses no se le estuvo administrando el medicamento al señor Mandry ni tampoco que por orden del doctor Jayson Vázquez no se le siguió administrando porque llevaba mucho tiempo sin administrar y que por ello, el doctor entendía que no era necesario.[46]

Testificó la señora Torres Soto que, aunque ella no estuvo presente, el señor Mandry fue hospitalizado "por una 408 en hospital psiquiátrico", porque se estaba descompensando.[47] Según ella, estar descompensado es un cambio en la condición, actitud y comportamiento, estar alterado, y hacerse daño o hacerles daño a otras personas o al personal del centro.[48] Añadió que posteriormente dieron de alta al señor Mandry, pero no regresó al Hogar.[49]

---

[42] *Íd.*, pág. 76, líneas 7-19 (Tomo I); pág. 83, línea 13; *Íd.*, pág. 584, líneas 2-19 (Tomo III).
[43] TPO del 9 de febrero de 2023, pág. 72, líneas 16-19 (Tomo I); pág. 73, líneas 1-19.
[44] *Íd.*, pág. 75, líneas 1-4.
[45] *Íd.*, pág.75, líneas 4-10.
[46] TPO del 14 de febrero de 2023, pág. 682, líneas 1-11 (Tomo III).
[47] *Íd.*, pág. 585, líneas 1-4.
[48] *Íd.*, pág. 605, líneas 1-7.
[49] *Íd.*, pág. 585, líneas 7-11.

Por otro lado, según la señora Torres Soto, el Kardex era un registro de medicamentos donde constaba la hora y la fecha en que se administraba el medicamento.[50] Testificó que ella imprimía el Kardex y lo verificaba,[51] pero que no constaba en el expediente médico de los pacientes porque se renovaban mensuales o semanales.[52]

**Testimonio de la señora Kammy Ángeles Negrón López**

La señora Negrón López indicó que era Directora de Operaciones y Administración del Hogar desde el 3 de enero de 2022.[53] Como directora, testificó estar a cargo de todas las necesidades del Hogar, incluyendo la planta física, las necesidades de enfermería, situaciones de salud, era el enlace con los pacientes y con los familiares, supervisaba la cocina, realizaba todo lo administrativo, estaba a cargo de los récords de los pacientes, los récords de los empleados, y orientaba a los familiares que deseaban traer personas de edad avanzada al Hogar.[54] Indicó también que era asistida en sus funciones por la señora Bermúdez Rivera y la señora Lissette Díaz.[55]

Según la señora Negrón López, ella se comunicó con el hijo del señor Mandry y este le expresó que el señor Mandry se puso agresivo en la oficina del psiquiatra, el doctor Creales, por lo que tuvieron que "sacar una 408", y posteriormente, lo ingresaron al Panamericano.[56]

En cuanto al Kardex, la señora Negrón López testificó que era un documento preparado por la farmacia donde se incluyeron todos los medicamentos, con las horas, los días y una leyenda de las

---

[50] TPO del 14 de febrero de 2023, pág. 316, líneas 8-10 (Tomo II).
[51] *Íd.*, pág. 717, líneas 18-19 (Tomo III); pág. 718, líneas 1-5.
[52] *Íd.*, pág. 718, líneas 18-19; pág. 719, líneas 1-2.
[53] TPO del 15 de febrero de 2023, pág. 758, líneas 18-19 (Tomo III); pág. 759, líneas 1-7.
[54] *Íd.*, pág. 759, líneas 13-18; pág. 760, líneas 1-2.
[55] *Íd.*, pág. 760, líneas 3-5.
[56] *Íd.*, pág. 784, líneas 2-13.

razones por las cuales no se les administró el medicamento y cada cuidador o enfermero tenía que firmar cuando le administra los medicamentos.[57] Según la señora Negrón López, el Kardex también mostraba el nombre del medicamento, el número de la receta, la dosis, cuántas veces al día, quién prescribió el medicamento, y cuándo expiraba el mismo.[58]

Testificó que en la inspección realizada por la agencia administrativa se encontraron Kardex sin firmas.[59]

**Testimonio de la señora María de Lourdes Torres Hernández**

Por su parte, la señora Torres Hernández indicó que era Supervisora de Trabajo Social del Departamento de la Familia para la región de Ponce. Expresó que, en el 2018, comenzó a trabajar como Trabajadora Social, y desde el 2019 hasta noviembre del 2022 fue asignada como Supervisora de Trabajo Social I de la UMIA.[60]

Respecto al señor Mandry, la señora Torres Hernández expresó que no le proveyeron los medicamentos, se descompensó cuando fue llevado por su hijo al psiquiatra y por eso allí mismo decidieron admitirlo en una institución.[61] Según la señora Torres Hernández, esa información surgió de una entrevista que le hizo la señora Irizarry de Jesús al hijo del señor Mandry, el señor Orlando Mandry.[62]

La señora Torres Hernández indicó también que mediante la investigación se corroboró que la señora Torres Soto, supervisora de enfermería del Hogar, omitía los medicamentos a los participantes sin consultar previamente con el médico; y encontró que no había notas de progreso de enfermería.[63] Reiteró que en las diversas visitas

---

[57] *Íd.*, pág. 1026, líneas 14-19 (Tomo IV); pág. 1017, líneas 17-19; *Íd.*, pág. 1018, líneas 1-2.
[58] *Íd.*, pág. 1027, líneas 1-2.
[59] *Íd.*, pág. 1,018, líneas 3-12.
[60] TPO del 20 de marzo de 2023, pág. 1,705, líneas 1-9 (Tomo VI).
[61] TPO del 21 de marzo de 2023, pág. 2367, líneas 5-8 (Tomo VIII).
[62] *Íd.*, pág. 1885, líneas 5-12 (Tomo VII).
[63] *Íd.*, pág. 1,787, líneas 8-10.

realizadas no hubo notas de progreso de enfermería y omitieron medicamentos.[64]

**Testimonio de la señora Ivonne Alicea Rodríguez**

La señora Alicea Rodríguez declaró que fue Investigadora de la UMIA.[65] Como investigadora, elaboraba un plan de investigación, se encargaba de analizar referidos, notificarle al operador sobre las alegaciones de los referidos, entrevistar informantes y empleados, hacer evaluaciones de seguridad, y se reunía con su supervisora para discutir hallazgos y elevar consultas a nivel central.[66] Además, sostuvo que determinaba si las investigaciones eran con fundamento; esto es, que las alegaciones eran correctas; o sin fundamento; a saber, no se probó que ocurrió lo alegado.[67]

La señora Alicea Rodríguez testificó que, en la segunda visita del 21 de diciembre del 2021, el registro de medicamentos continuaba sin actualizar y la licencia del establecimiento seguía vencida.[68]

En cuanto al Kardex, no estaba iniciado en todas sus partes, indicó la señora Alicea Rodríguez.[69] También expuso que la señora Torres Soto no administraba medicamentos prescritos por el médico.[70]

**(1) "Además, se realizaron advertencias sobre el personal que cocinaba y no tenían el curso de inocuidad".[71]**

**Testimonio de la señora Kammy Ángeles Negrón López**

Respecto al curso de inocuidad, la señora Negrón López explicó que se tomó para el manejo de alimentos y tenía vigencia de

---

[64] *Íd.*, líneas 14-15.
[65] TPO del 23 de marzo de 2023, pág. 2,423, líneas 4-16 (Tomo IX); pág. 2,424, línea 1.
[66] *Íd.*, pág. 2,424, líneas 2-18; pág. 2,425, líneas 1-3.
[67] *Íd.*, pág. 2,425, líneas 4-10.
[68] *Íd.*, pág. 2,484, líneas 16-17; pág. 2,488, líneas 18-19.
[69] *Íd.*, pág. 2,552, líneas 4-6.
[70] *Íd.*, líneas 9-10.
[71] Apéndice del recurso de revisión judicial, Anejo 2, pág. 83; véase además, Recurso de revisión judicial, pág. 21.

cinco (5) años.[72] Explicó que si los empleados no pasaban el curso de inocuidad no podían trabajar en la cocina.[73]

La señora Negrón López sostuvo que el señor José Hernández Bergara era el cocinero del Hogar, y contaba con el curso de inocuidad; y que la señora Bermúdez Rivera era la dueña del Hogar y "bateadora emergente" en la cocina, si se necesita.[74] Añadió que el señor Ramón Pabón Medina trabajaba part-time y en casos de emergencia.[75]

En cuanto a las personas que no tenían aprobadas esas certificaciones, sostuvo que, eran asistentes de cocina, y lo que hacían era fregar y llevar alimentos a los pisos.[76] Expuso que esos puestos estaban ocupados por la señora Ivette Santiago y la señora Lydia Soto.[77] Además, indicó que a lo mejor ambas empleadas cocinaban en el fin de semana, y admitió que ambas empleadas no estaban acreditadas, para realizar la preparación de los alimentos.[78]

**Testimonio de la señora Ivonne Alicea Rodríguez**

La señora Alicea Rodríguez testificó que el menú certificado que le habían entregado era del 2019 y estaba vencido.[79] Agregó que el menú no estaba escrito en la pizarra, cuando en el reglamento indicaba que los residentes debían tener el menú en una pizarra para que ellos supiesen cuáles iban a ser los alimentos ese día.[80]

Además, testificó que, como parte de los hallazgos, la señora Ivette Santiago y la señora Iris Soto no contaban con el curso de inocuidad, un curso de manejo de alimentos certificado, contrario al Reglamento Núm. 7349-2007, *supra*.[81] Testificó que, durante una

---

[72] TPO del 15 de febrero de 2023, pág. 922, líneas 14-17 (Tomo IV).
[73] *Íd.*, pág. 949, líneas 17-19; pág. 950, líneas 1-2.
[74] *Íd.*, pág. 922, líneas 1-10.
[75] *Íd.*, pág. 938, líneas 16-19; *Íd.*, pág. 939, líneas 13-19; *Íd.*, pág. 940, líneas 1-5.
[76] *Íd.*, pág. 937, líneas 13-19.
[77] *Íd.*, pág. 938, líneas 1-3.
[78] *Íd.*, pág. 1130, líneas 1-3; pág. 1131, líneas 7-9.
[79] TPO del 23 de marzo de 2023, pág. 2456, líneas 1-3 (Tomo IX).
[80] *Íd.*, líneas 7-13.
[81] *Íd.*, pág. 2455, líneas 5-9.

visita posterior, ya la señora Iris Soto tenía el curso de inocuidad, pero no así la señora Ivette Santiago no.[82]

La señora Alicea Rodríguez testificó que, en una visita de seguimiento, realizada el 21 de diciembre de 2021, nuevamente, el área de la cocina no estaba confeccionando los alimentos por el ciclo del menú presentado, y los alimentos servidos eran altos en sodio, azúcares y grasas.[83]

**Testimonio de la señora María de Lourdes Torres Hernández**

La señora Torres Hernández expresó que, de la evaluación que hicieron sus compañeras, los alimentos no cumplían en muchas ocasiones por ser alto en sodio y azúcares.[84] La señora Torres Hernández testificó que la importancia del ciclo del menú es que el Hogar cocine o confeccione todos los alimentos de acuerdo con las condiciones de los adultos mayores.[85]

La señora Torres Hernández expresó que, como parte de sus hallazgos, el Hogar no mostraba la comida en una pizarra y que eso constituía negligencia.[86] Aceptó que debía haber un menú en una pizarra para que los residentes supiesen lo que iban a comer.[87]

Testificó la señora Torres Hernández que en la visita celebrada el 21 de diciembre del 2021, el sello del ciclo del menú de la nutricionista que certificaba el menú estaba vencido.[88]

**(2) "[E]l HLA no contaba con el personal adecuado para ofrecer los servicios de calidad en beneficio de los adultos mayores".[89]**

---

[82] *Íd.*, pág. 2501, líneas 6-9.
[83] *Íd.*, pág. 2484, líneas 16-17; pág. 2486, líneas 8-10.
[84] TPO del 20 de marzo de 2023, pág. 1815, líneas 13-15 (Tomo VII).
[85] *Íd.*, pág. 1936, líneas 1-3.
[86] *Íd.*, pág. 1811, líneas 7-10.
[87] *Íd.*, pág. 1814, líneas 17-19; *Íd.*, pág. 1815, línea 1.
[88] *Íd.*, pág. 1,993, líneas 1-3.
[89] Apéndice del recurso de revisión judicial, Anejo 2, pág. 84; véase además, Recurso de revisión judicial, pág. 22.

**Testimonio de la señora Emelisa Bermúdez Rivera**

Por su parte, la señora Bermúdez Rivera indicó que era la Dueña y Presidenta del Hogar.[90] Adujo también que tenía el personal adecuado según el reglamento, pero cuando la señora Negrón llegó al Hogar tuvo que contratar personal adicional que hacía falta.[91]

**Testimonio de la señora María Torrez Hernández**

Índico la señora Torres Hernández que hacía falta personal.[92] Expresó que el Hogar incurrió en negligencia al no tener personal conforme a la tabla de proporción del Reglamento Núm. 7349-2007, *supra*. Específicamente, sostuvo que podría incurrir en negligencia porque tenían alrededor de treinta (30) participantes y dos (2) empleados por turno, cuando se supone que tuviesen más personal.[93]

**Testimonio de la señora Ivonne Alicea Rodríguez**

La señora Alicea Rodríguez indicó que encontró que el Hogar no contaba con la cantidad de personal adecuada, según lo requiere el reglamento y la matrícula. Como ejemplo, explicó que tuvieron un (1) empleado para nueve (9) participantes cuando se supone que fuesen dos (2) empleados.[94]

> **(3) "*Quedó demostrado que [la señora Luz Quiñones] falleció a causa de la aspiración de su propio vómito*" y que esto fue por falta de una atención adecuada.[95] (Énfasis suplido en el original).**

**Testimonio de la señora Lymarie Torres Soto**

Indicó la señora Torres Soto que existían tratamientos para atender los vómitos de la señora Luz Quiñones.[96]

---

[90] TPO del 15 de febrero de 2023, pág. 1,252, líneas 10-12 (Tomo V).
[91] TPO del 16 de febrero de 2023, pág. 1,521, líneas 1-12 (Tomo VI).
[92] TPO del 20 de marzo de 2023, pág. 1,980, líneas 9-11 (Tomo VII).
[93] *Íd.*, pág. 1,979, líneas 18-19; pág. 1,980, líneas 1-4.
[94] TPO del 23 de marzo de 2023, pág. 2,583, líneas 4-14 (Tomo IX).
[95] Apéndice del recurso de revisión judicial, Anejo 2, págs. 86-87; véase además, Recurso de revisión judicial, pág. 23.
[96] TPO del 14 de febrero de 2023, pág. 408, líneas 10-13 (Tomo II).

La señora Torres Soto testificó que la señora Quiñones estaba en una etapa avanzada de Alzheimer, y debía ser asistida en todo momento porque no poseía capacidad de absolutamente nada y no podía comer por disfagia, que es que no puede tragar.[97] Añadió que tenía una sonda nasogástrica, un tubo que va desde la nariz hasta el estómago, para poder alimentarla.[98] Relató que, al padecer de Alzheimer avanzado, tenía que ser asistida en todo incluyendo medicación, alimentación y aseo; con la succión de las secreciones de saliva cuando tosía; se le suministraban los medicamentos por sonda; y se le proveían terapias respiratorias y medicamentos para la acidez.[99]

Declaró que no estuvo en el Hogar el día que la paciente comenzó a confrontar problemas. Testificó que la cuidadora Vanelangelly Ramos se comunicó con ella y le indicó que la paciente estaba vomitando. La señora Torres Soto expuso que le impartió instrucciones de no darle alimentación enteral porque estaba vomitando.[100] Expresó que no impartió instrucciones de que la llevaran al hospital,[101] y expuso que las instrucciones anticipadas del familiar de la paciente eran para no entubar ni resucitar.[102]

La señora Torres Soto indicó que la situación fue manejada por la señora Negrón López.[103] Según adujo, no se comunicó con el médico de cabecera, y le dio instrucciones a un cuidador sin haberlo consultado con el médico.[104]

Expuso que, en algunos casos como cuando no existe documento legal alguno, el paciente es llevado al hospital, aunque

---

[97] TPO del 9 de febrero de 2023, pág. 119, líneas 17-19 (Tomo I); pág. 120, líneas 1-5.
[98] *Íd.*, pág. 122, líneas 3-15.
[99] *Íd.*, pág. 123, líneas 2-12.
[100] *Íd.*, pág. 118, líneas 5-10.
[101] TPO del 14 de febrero de 2023, pág. 403, líneas 18-19 (Tomo II); pág. 404, líneas 1-3.
[102] *Íd.*, pág. 406, líneas 13-15.
[103] *Íd.*, pág. 421, líneas 14-17.
[104] *Íd.*, pág. 422, líneas 16-18; pág. 423, líneas 1-6.

el familiar no lo quiera.[105] Sostuvo que dependiendo como ella veía al paciente y considerando los datos objetivos, ella podía optar por llevar al paciente al hospital.[106]

Además, testificó la señora Torres Soto que desconocía si la muerte de la señora Quiñones se debió al ahogo en vómito.[107]

**Testimonio de la señora Kammy Ángeles Negrón López**

La señora Negrón López sostuvo que la señora Quiñones tenía ochenta y siete (87) años.[108]

Indicó que la cuidadora Vanelangelly Ramos le informó después del mediodía que la señora Quiñones había tenido dos (2) vómitos y una diarrea. Testificó que, ante eso, ella subió a ver a la señora Quiñones y en ese momento la estaban limpiando y succionando, por lo que bajó a su oficina y llamó a la jefa de enfermería, la señora Torres Soto, para informarle sobre la situación. Según indicó, la señora Torres Soto no se encontraba en el Hogar ese día por lo que trató de comunicarse con el doctor Jayson Vázquez, pero nunca le respondió.[109]

Sostuvo la señora Negrón López que se presentó una sobrina al Hogar y una hermana de la señora Quiñones.[110] Expresó que hablaron con la policía y emergencias médicas certificó que la señora Quiñones estaba muerta y que no hubo signos de maltrato. También indicó que la boleta del fiscal fue enviada por WhatsApp para que la funeraria se llevara el cadáver, realizó los arreglos con la funeraria, y todo ese proceso finalizó a las 4am.[111]

---

[105] TPO del 14 de febrero de 2023, pág. 645, líneas 16-19 (Tomo III); pág. 646, líneas 2-6.
[106] *Íd.*, pág. 649, líneas 8-15.
[107] TPO del 14 de febrero de 2023, pág. 414, líneas 16-19 (Tomo II); pág. 415, líneas 1-4.
[108] TPO del 15 de febrero de 2023, pág. 826, líneas 7-8 (Tomo III).
[109] *Íd.*, pág. 822, líneas 1-15.
[110] *Íd.*, pág. 834, líneas 1-5.
[111] *Íd.*, pág. 835, líneas 1-11.

Testificó la señora Negrón López que la señora Quiñones no fue llevada a una sala de emergencias los días 24 y 25 de marzo de 2022, y tampoco recibió atención médica.[112]

**Testimonio de la señora Emelisa Bermúdez Rivera**

La señora Bermúdez Rivera leyó para récord el inciso sexto del contrato de servicios firmado por el hijo de la señora Quiñones y ella. Este inciso indicaba que, en caso de emergencia, el Hogar debía mover a la envejeciente a la sala de emergencia del hospital más cercano, mediante ambulancia y el represente tenía que sumir ese gasto o el deducible de Medicare. [113]

**Testimonio de la señora María de Lourdes Torres Hernández**

Adujo la señora Torres Hernández que el caso de la señora Quiñones trató de falta de atención médica y contrario al reglamento de la UMIA.[114] Afirmó la señora Torres Hernández que, el punto clave para recomendar que no se renovara la licencia del Hogar fue el caso de la señora Quiñones.[115] Expresó además que:

> Este… Este [sic] caso de Luz Quiñones fue lo que nosotros concluimos para fundamentar la… dar… la… dar la [sic] recomendación de no renovación de licencia porque el 7 de marzo, desde el 25 de octubre, pero, el 7 de marzo, de conocimiento propio, se orientó al personal del Hogar Las Águilas, en este caso, la [s]eñora Kammy Negrón que estaba allí, que tomara acción si un 'enve'… [sic] un adulto mayor requiere atención médica, que no esperara por familiares, porque aquí lo que estamos tratando es de darle la mejor calidad de vida y protegiendo. Cosa que no se hizo.[116] .

En otras palabras, testificó la señora Torres Hernández que la muerte de la señora Quiñones ocurrió en menos de 30 días de haber recibido la orientación, sobre el particular y no se cumplió con la recomendación.[117]

---

[112] TPO del 15 de febrero de 2023, pág. 1,221, líneas 1-7 (Tomo V).
[113] TPO del 16 de febrero de 2023, pág. 1,504, líneas 6-16 (Tomo VI); pág. 1,506, líneas 17-19; pág. 1,507, líneas 1-6.
[114] TPO del 20 de marzo de 2023, pág. 1,926, líneas 5-10 (Tomo VII).
[115] *Íd.*, pág. 1,792, líneas 6-12.
[116] *Íd.*, pág. 1,953, líneas 16-19; pág. 1,954, líneas 1-3.
[117] *Íd.*, pág. 1,954, líneas 4-14.

**Testimonio de la señora Ivonne Alicea Rodríguez**

La señora Alicea Rodríguez sostuvo que el cuarto referido lo presentó el médico de cabecera de la señora Quiñones. Expuso que el informante alegó que la señora Quiñones estuvo vomitando desde el 24 de marzo de 2022, pero no la llevaron a sala de emergencia ni recibió atención médica, por lo cual falleció el 25 de marzo de 2022. Indicó que en ningún momento él recibió una llamada hasta que lo llamaron de la funeraria 14 horas luego. Expuso que no era la primera vez que el Hogar afirmaba que lo llamaban y no era cierto.[118]

Indicó que en el reporte de turnos se encontró que la señora Torres Soto, supervisora de enfermería, dio instrucciones para omitir medicamentos para el reflujo de la señora Quiñones por presión arterial baja.[119]

**Testimonio de la doctora Leila Vanessa Malavé Félix**

La doctora Malavé Félix testificó ser Pediatra Intensivista y Doctora de Medicina Integrativa. Indicó ser también un perito que utilizaba el Departamento de la Familia para los casos de impedidos e intervenía, como perito médico, en todo lo que tenía que ver con maltrato institucional.[120] Añadió ser un perito con subespecialidad en medicina integrativa, acupuntura, ética de derecho al paciente, principio y final de vida y consentimiento informado dentro de la ética.[121]

La doctora Malavé Félix sostuvo que en el caso de la señora Quiñones la paciente tenía un equipo de succión para succionar el contenido gástrico o las secreciones de boca o nariz. Indicó que la paciente tenía oxígeno disponible y una cama de posiciones que podía ser elevada impidiendo así que el vómito no la dejara respirar. La doctora Malavé Félix testificó que, "[e]stoy clara que la señora

---

[118] TPO del 23 de marzo de 2023, pág. 2,539, líneas 1-13 (Tomo IX).
[119] *Íd.*, pág. 2,547, líneas 16-19.
[120] TPO del 17 de julio de 2023, pág. 13, líneas 16-22.
[121] *Íd.*, pág. 14, líneas 1-9.

Quiñones era una paciente terminal, pero esto no implica que muriera ahogada por su propio vómito".[122]

Arguyó que llegó a esa conclusión ya que del expediente se desprendía que "tuvo dos vómitos y ahí se deteriora más. Y en ningún momento dice que se succionó o se le puso oxígeno y que la paciente mejoró o siguió deteriorando".[123] Ella expuso que si la cuidadora de la paciente señalaba que estaba vomitando y que la paciente se estaba deteriorando, lo lógico era, que, si tenía máquinas de succión y forma de medir la saturación, "se describiera que se proveyó esto y le dijeran a la señora Negrón: 'Mire, señora Negrón, yo succioné a la paciente. Le detuve la comida, le puse oxígeno, pero esta paciente sigue deteriorando', [pero] [n]o aparece en el expediente nada de esto".[124]

La doctora Malavé Félix fue enfática en que a la señora Luz Quiñones no le proveyeron una muerte con dignidad, higiene y comodidad. Sostuvo que, si no podían contactar al médico primario ni a nadie, tenían que llevarla a sala de emergencia.[125]

**(4) Varios residentes sufrieron caídas y eso demuestra falta de seguridad y supervisión dentro del Hogar. Además, "se evidenció que durante la investigación de los referidos murieron varios participantes, entre los que se encontraban: Ada Adaime, Armando Collazo, Luz Quiñones y José Dila Cotton.[126]**

**Testimonio de la señora Ivonne Alicea Rodríguez**

La señora Alicea Rodríguez indicó haber entrevistado a unos empleados que ofrecieron información de múltiples caídas.[127] Expresó que esas caídas ocurrieron por falta de supervisión. Expuso también que, de esas caídas informadas, ella confirmó que

---

[122] *Íd.*, pág. 79, líneas 2-10.
[123] *Íd.*, pág. 79, líneas 15-22.
[124] *Íd.*, pág. 80, líneas 3-13.
[125] *Íd.*, pág. 81, líneas 1-11.
[126] Recurso de revisión judicial, pág. 24; véase además, Apéndice del recurso de revisión judicial, Anejo 2, págs. 87-88.
[127] TPO del 23 de marzo de 2023, pág. 2609, líneas 1-2 (Tomo IX).

ocurrieron cuatro (4).[128] Testificó que se encontró que hubo negligencia, un indicador por falta de supervisión, en las vistas se observó que no contaban con el personal requerido, según la tabla de proporción de la matrícula que establece el Reglamento Núm. 7349-2007, *supra*; y que lo anterior fue corroborado por la Oficina de Licenciamiento.[129]

**(5) "Se pasó prueba de que por un periodo de tiempo el Hogar utilizaba unos aditamentos llamados pecherines para mantener erguido en una silla a un adulto mayor. El Informe de la Oficial Examinadora concluye que esto era maltrato pues violentaba la norma que prohíbe restricciones involuntarias 'a menos que exista una orden médica o legal', lo cual no existía en este caso".[130]**

**Testimonio de la señora Kammy Ángeles Negrón López**

La señora Negrón López testificó que el Hogar estaba utilizando un chaleco de seguridad para el sillón de rueda, ya que la mayoría de los pacientes de la institución eran pacientes de Alzheimer y demencia.[131] Sostuvo que ese pecherín se utilizaba al momento de alimentarlos para mantenerlos derechos y aguantarles el pecho en la silla de ruedas.[132]

**Testimonio de la señora Ivonne Alicea Rodríguez**

Sostuvo la señora Alicea Rodríguez que la paciente Lucy Martinó fue una de las pacientes que encontró restringida con un pecherín. Indicó que estaba restringida a pesar de no tener orden médica.[133]

Posteriormente, en el caso de marras, el 31 de octubre de 2023, la Junta Adjudicativa, a través de la Oficial Examinadora, la

---

[128] *Íd.*, líneas 4-13

[129] *Íd.*, pág. 2582, líneas 3-8.

[130] Apéndice del recurso de revisión judicial, Anejo 2, pág. 88; véase además, Recurso de revisión judicial, pág. 24.

[131] TPO del 15 de febrero de 2023, pág. 1,029, líneas 18-19 (Tomo IV); pág. 1030, línea 1.

[132] *Íd.*, pág. 1,031, líneas 2-14; pág. 1,036, líneas 6-19.

[133] TPO del 23 de marzo de 2023, pág. 2,449, líneas 11-13 (Tomo IX).

licenciada Olga B. Rosas Vélez, emitió un *Informe Oficial Examinador Enmendado*, enmendado el 2 de noviembre de 2023.[134]

El 31 de octubre de 2023, la Junta Adjudicativa emitió también una *Resolución*, notificada y archivada el 2 de noviembre de 2023, al acoger el informe de la oficial examinadora enmendado, por la que acogió la recomendación de confirmar la determinación sobre maltrato institucional con fundamento.[135]

Insatisfecha con la determinación, el 21 de noviembre de 2023, la parte recurrente presentó una *Solicitud de Reconsideración*.[136]

El 28 de noviembre de 2023, la Junta Adjudicativa emitió una *Resolución en Reconsideración*, notificada y archivada ese mismo día, mediante la cual denegó la petición de reconsideración presentada por la parte recurrente.[137]

En desacuerdo, el 28 de diciembre de 2023, la parte recurrente presentó un recurso de revisión judicial en el caso de autos por el que solicitó la revisión de la *Resolución* emitida por la Junta Adjudicativa el 31 de octubre de 2023, cuya reconsideración fue denegada el 28 de noviembre de 2023. En específico, le imputó a la Junta Adjudicativa la comisión de los siguientes cuatro (4) errores:

> PRIMER ERROR: EL INFORME DE LA OFICIAL EXAMINADORA Y LA RESOLUCIÓN DE LA JUNTA ADJUDICATIVA, DEJARON DE APLICAR EL ESTÁNDAR Y LA CARGA PROBATORIA CORRECTA, LO QUE INVALIDA LAS CONCLUSIONES DE QUE LA PARTE APELANTE INCURRIÓ EN MALTRATO[.]
>
> SEGUNDO ERROR: EL INFORME DE LA OFICIAL EXAMINADORA Y LA RESOLUCIÓN DE LA JUNTA ADJUDICATIVA, SE EQUIVOCARON AL SOSTENER CONCLUSIONES DE QUE HUBO MALTRATO, CUANDO EN REALIDAD SE TRATABA DE SEÑALAMIENTOS SOBRE SUPUEST[A]S INFRACCIONES REGLAMENTARIAS RELATIVAS A REQUISITOS DE LICENCIAMIENTO[.]

---

[134] Apéndice del recurso de revisión judicial, Anejo 2, págs. 25-89.
[135] *Id.*, Anejo 3, págs. 90-93.
[136] *Íd.*, Anejo 5, págs. 97-106.
[137] *Íd.*, Anejo 4, págs. 94-96.

TERCER ERROR: EL INFORME DE LA OFICIAL EXAMINADORA Y LA RESOLUCIÓN DE LA JUNTA ADJUDICATIVA, SE EQUIVOCARON AL SOSTENER CONCLUSIONES DE QUE HUBO MALTRATO, SIN QUE HUBIERA EVIDENCIA SUSTANCIAL QUE AS[Í] LO SOSTUVIERA[.]

CUARTO ERROR: EL INFORME DE LA OFICIAL EXAMINADORA Y LA RESOLUCIÓN DE LA JUNTA ADJUDICATIVA, CONSTITUYEN ACTUACIONES ARBITRARIAS Y CAPRICHOSAS[.]

El Hogar arguyó que el Departamento de la Familia aplicó el estándar de prueba aplicable incorrecto; a saber, preponderancia de la prueba. Específicamente sostuvo que, como el proceso administrativo del caso de marras conllevaba la posibilidad de que la dueña del Hogar, la señora Bermúdez Rivera, fuese privada de su sustento ante la privación de la licencia del Hogar para operar una actividad regulada por el Estado, aplicaba el estándar de prueba clara, robusta y convincente, a la luz de *Oficina de Ética Gubernamental v. Martínez Giraud*, 210 DPR 79 (2022) y *Oficina del Comisionado de Seguros v. Option Health Care Network, Inc.*, KLRA201200834 (TA PR 31 de marzo de 2014). Por último, el Hogar indicó que el Departamento de la Familia decidió hacer suyos los señalamientos del licenciamiento para convertirlos en unos sobre maltrato.

Por su parte, el 6 de septiembre de 2024, la parte recurrida, representada por el Procurador General, radicó un *Alegato del Departamento de la Familia*. Expresó que lo resuelto en *Oficina de Ética Gubernamental v. Martínez Giraud*, supra, se limitó a infracciones de ética gubernamental y que, en dicho caso, nuestro máximo foro reiteró que el *quantum* de prueba necesario para prevalecer en el ámbito administrativo era el de la preponderancia de la prueba. Añadió el Procurador General que incluso la Junta Adjudicativa del Departamento de la Familia ostentaba un esquema reglamentario acorde con el ordenamiento administrativo y la *Ley*

*de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU), 3 LPRA secs. 9601 *et seq.*, distinto a la reglamentación de la Oficina de Ética Gubernamental.

Arguyó también el Procurador General que la UMIA y la Oficina de Licenciamiento son independientes y cada una realiza su recomendación conforme a los criterios existentes en la reglamentación aplicable. Sostuvo que el caso de licenciamiento fue uno independiente al de maltrato institucional, empero que era claro que una determinación con fundamento sobre maltrato podía incidir en la determinación de dicho licenciamiento. Lo anterior pues, ante unos hallazgos como los del caso de autos, "pobre servicio haría el Estado otorgándole una licencia a una institución, para atender a un sector tan vulnerable, como lo es las personas que son ubicadas en esos hogares, para no recibir un trato digno en sus últimos años de vida".[138] Por último, el Procurador General expuso que la prueba presentada corroboró los hallazgos de maltrato y negligencia contenidos en el Informe de la Oficial Examinadora.

Posteriormente, el 21 de octubre de 2024, el Hogar presentó un *Alegato Suplementario de la Parte Peticionaria* en el que sostuvo los mismos planteamientos sobre el primer y segundo señalamiento de error por no tratar sobre la apreciación de la prueba. Sobre la alegada descompensación del señor Mandry, alegó la parte recurrente que no hubo evidencia médica de tal incidente y que esa información fue provista por la trabajadora social Irizarry de Jesús de una entrevista que le realizó la señora Negrón López al hijo del señor Mandry. Por lo tanto, no le constaba de propio conocimiento. Por otro lado, arguyó que, si bien se había encontrado que personal sin el curso de inocuidad trabajó en la cocina algunos sábados, no había evidencia de una práctica sistemática al respecto; y que las

---

[138] Alegato del Departamento de la Familia, pág. 20.

empleadas a quienes les faltaba tomar el curso de inocuidad lo tomaron y al no pasarlo, prescindieron de sus servicios. Además, la parte recurrente alegó que, aunque faltaban refuerzos cuando llegó la señora Negrón López, a partir de su llegada, el Hogar contaba con el personal adecuado, asunto que sostuvo fue apoyado por el testimonio de la señora Bermúdez Rivera.

En cuanto a la señora Quiñones, expuso la parte recurrente que no había controversia sobre sus episodios de vómito y su muerte entre el 24 y 25 de marzo de 2022. Sin embargo, sostuvo que la conclusión de que la residente falleció a causa de la aspiración de su propio vómito y por falta de atención adecuada, fue una inferencia y producto del testimonio de la perito y doctora Malavé Félix, y no de entrevistas que se le pudo haber realizado a las personas que acompañaron a la señora Quiñones durante sus últimos momentos de vida. Con relación a las caídas de cinco residentes, la parte recurrente arguyó que no existe evidencia sustancial para apoyarlo. Por último, indicó la parte recurrente que la conclusión de maltrato por el uso de pecherines era irrazonable porque se utilizaban para darles de comer a los adultos de mayor edad, ya que se iban hacia al frente de no usarlos.

El 6 de diciembre de 2024, la parte recurrida radicó su réplica intitulada *Escrito en Cumplimiento de Resolución*. En síntesis, alegó que los cuatro referidos constituían maltrato y que el Departamento de la Familia ostentaba la facultad de realizar una investigación al respecto. Para ello, la señora Alicea Rodríguez visitó el Hogar en varias ocasiones para informarles sobre los referidos, y les brindó recomendaciones para resolver y corregir las situaciones referidas e investigadas. Además, reiteró que las investigaciones sobre supuesto maltrato y renovación de licenciamiento eran independientes, pero a la Oficina de Licenciamiento se le entregaba

un resumen sobre los hallazgos de la otra investigación. Arguyó también que, según el testimonio de la supervisora de la UMIA, la señora Torres Hernández, cuando una muerte era injustificada, el operador o la persona responsable no poseía las capacidades administrativas necesarias o las capacidades protectoras para atender una matrícula vulnerable, se le podía recomendar a la oficina de licenciamiento la no renovación de la licencia o el cierre del hogar.

Sostuvo la parte recurrida que la recomendación de no renovar la licencia se debió fundamentalmente por la falta de atención médica incluyendo inconsistencia en el registro de medicamentos, expedientes médicos sin actualizar, no haber activado el protocolo requerido cuando una persona necesita atención médica como el caso de la señora Quiñones y que la negligencia del trato a esta residente fue apoyada por el testimonio de la perita y doctora Malavé Félix; no se le brindaron medicamentos de salud mental al señor Mandry, según quedó demostrado con el testimonio de la señora Torres Soto, y ello resultó en su descompensación. Además, encontraron que no añadieron a la pizarra el menú; continuaban cocinando alimentos altos en grasa, azúcar y sodio; que la licencia del Hogar estaba vencida desde el 10 de diciembre de 2021; la enfermera no poseía la capacidad de explicar los acontecimientos y las acciones que sucedieron; y que el personal no demostró tener las capacidades protectoras para atender los referidos; al igual que falta de supervisión.

Reiteró además que la determinación del foro primario en la *Sentencia* en el caso PO2022CV02093 consolidado con PO2022CV01929 no atendió los méritos de los referidos sobre alegado maltrato por reconocer que esa controversia estaba ante la consideración de la Junta. Indicó la parte recurrida que el único

efecto de dicha determinación fue que el establecimiento continuara operando bajo la supervisión del Departamento de la Familia mientras se dilucidaban los méritos de la controversia ante la Junta.

**III.**

**A.**

Como cuestión de umbral es imprescindible recalcar el estándar de revisión judicial aplicable cuando los casos provienen de agencias administrativas. Según la doctrina de revisión judicial, los tribunales tienen el deber de auscultar si las determinaciones administrativas fueron emitidas en virtud de los poderes delegados a la agencia y de su política pública. *Capó Cruz v. Junta de Planificación*, 204 DPR 581, 590 (2020); *Torres Rivera v. Pol. de PR*, 196 DPR 606, 625-626 (2016). No obstante, "los tribunales revisores debemos conceder deferencia a las decisiones de las agencias administrativas, pues estas gozan de experiencia y conocimiento especializado sobre los asuntos ante su consideración, lo cual ampara sus dictámenes con una presunción de legalidad y corrección". *Capó Cruz v. Junta de Planificación*, supra, pág. 591; *Torres Rivera v. Pol. de PR*, supra, pág. 627. Es por ello que, a tenor con la Sección 4.5 de la LPAU, *supra*, sec. 9675, el alcance de las revisiones judiciales comprende tres (3) aspectos: (1) si el remedio concedido por la agencia administrativa es apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial; y (3) si las conclusiones de derecho fueron correctas, mediante una revisión de estas en todos sus aspectos. Véase, además, *Capó Cruz v. Junta de Planificación*, supra, pág. 591; *Torres Rivera v. Pol. de PR*, supra, págs. 626-627; *Asoc. FCIAS v. Caribe Specialty II*, 179 DPR 923, 940 (2010). De hecho, hasta que "no se demuestre mediante evidencia suficiente que la presunción de legalidad ha sido superada

o invalidada, el respeto hacia la resolución administrativa debe sostenerse". *Oficina de Ética Gubernamental v. Martínez Giraud*, supra, pág. 89; *Capo Cruz v. Junta de Planificación*, supra, pág. 591.

En cuanto a las *determinaciones de hecho*, estas deben sostenerse si se fundamentan en evidencia sustancial que surja de la totalidad del expediente administrativo. *Capó Cruz v. Junta de Planificación*, supra, pág. 591; *Rolón Martínez v. Caldero López*, 201 DPR 26, 35-36 (2018). Este criterio busca "'evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor'". *Oficina de Ética Gubernamental v. Martínez Giraud*, supra, pág. 90 (*citando a Torres Rivera v. Pol. de PR*, supra, págs. 627). En esa línea, el Tribunal Supremo de Puerto Rico ha repetido la definición de prueba sustancial como "aquella prueba relevante que 'una mente razonable podría aceptar como adecuada para sostener una conclusión'". *Capó Cruz v. Junta de Planificación*, supra, pág. 591; *Rebollo v. Yiyi Motors*, 161 DPR 69, 76-77 (2004). Por lo tanto, los tribunales deben "respetar las resoluciones administrativas hasta tanto no se demuestre mediante evidencia suficiente que la presunción de legalidad ha sido superada o invalidada". *Capó Cruz v. Junta de Planificación*, supra, pág. 591; *Torres Rivera v. Pol. de PR*, supra, pág. 626.

Por otro lado, las *determinaciones de derecho* podrán ser revisables en todos sus aspectos por los tribunales. Artículo 4.5 de la LPAU, *supra*, sec. 9675; *Capó Cruz v. Junta de Planificación*, supra, pág. 591; *Torres Rivera v. Pol. de PR*, supra, págs. 626. Nuevamente la revisión judicial no debe servir para sustituir el criterio o la interpretación de la agencia administrativa de forma automática. *Capó Cruz v. Junta de Planificación*, supra, pág.

591; ***Rebollo v. Yiyi Motors***, supra, pág. 77. Los tribunales podrán descartar ese criterio, no obstante, cuando "no se pueda hallar fundamento racional que explique o justifique el dictamen administrativo". ***Rolón Martínez v. Caldero López***, supra, pág. 36.

El criterio para seguir al momento de pasar juicio sobre la determinación del foro administrativo es la razonabilidad de la actuación de la agencia. ***Oficina de Ética Gubernamental v. Martínez Giraud***, supra, pág. 89; ***Torres Rivera v. Pol. de Puerto Rico***, supra, pág. 626. En ese extremo, los tribunales solo deben intervenir con las decisiones administrativas cuando estas han actuado de forma arbitraria, ilegal, irrazonablemente o cuando se lesionan derechos constitucionales fundamentales. ***Capó Cruz v. Junta de Planificación***, supra, pág. 591; ***Torres Rivera v. Pol. de PR***, supra, págs. 627-628; ***Asoc. FCIAS v. Caribe Specialty II***, supra, pág. 941; ***JP, Plaza Santa Isabel v. Cordero Badillo***, 177 DPR 177, 187 (2009). En esos casos, cederá la deferencia que merecen las agencias administrativas en la aplicación e interpretación de las leyes y los reglamentos que administra. ***Rolón Martínez v. Caldero López***, supra, pág. 36; ***Torres Rivera v. Pol. de PR***, supra, págs. 627-628.

## B.

Es norma de derecho reiterada y establecida que, en general, "el peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia, o quien sostiene la afirmativa en el asunto en controversia". ***Oficina de Ética Gubernamental v. Martínez Giraud***, supra, pág. 97; Regla 110 (A) y (B) de Evidencia, 32 LPRA VI, R. 110 (A) y (B). En otras palabras, tiene que probar con prueba suficiente que sus alegaciones no constituyen meros señalamientos, sino un reclamo cierto y sostenible, pues lo contrario atentaría

contra los principios más elementales de justicia. ***Oficina de Ética Gubernamental v. Martínez Giraud***, supra, pág. 97.

Como norma general, "el *quantum* de prueba necesario para prevalecer en el ámbito administrativo es el de preponderancia de la prueba". *Íd.*, pág. 93. No obstante, los procesos administrativos que impliquen violaciones éticas "suponen aquilatar la prueba desde una óptica más rigorosa y exigente que la mera preponderancia de prueba". *Íd.*, pág. 96. La prueba clara, robusta y convincente "es un estándar intermedio de suficiencia de la prueba que, en esencia, es más exigente que el comúnmente aplicado estándar de preponderancia de la prueba en casos civiles, pero que, a su vez, es menos rigoroso que la prueba establecida más allá de duda razonable". *Íd.*, pág. 93. Este tipo de prueba es descrita como la "evidencia que produce en un juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables". *Íd.*, pág. 94.

Conforme a ello, nuestro máximo foro ha reiterado que el estándar de prueba clara, robusta y convincente es el requerido por nuestro ordenamiento ético disciplinario para imponer sanciones, lo cual se estableció bajo el supuesto de que está en juego el derecho fundamental a ganarse un sustento. *Íd.*

### C.

Por otra parte, la *Carta de Derechos y la Política Pública del Gobierno a Favor de los Adultos Mayores*, Ley Núm. 121 del 1 de agosto de 2019 (Ley Núm. 121-2019), según enmendada, 8 LPRA secs. 1511 *et seq.*, "reconoce la responsabilidad del Estado de mejorar las condiciones de vida de la población de adultos mayores y, además, garantizar el bienestar de éstos". Artículo 2 de la Ley Núm. 121-2019, supra, sec. 1512. Del mismo modo, a través de esta ley, "se refuerza la responsabilidad del Estado en preservar la

integridad física y emocional de los adultos mayores, a los fines de fortalecer y hacer cumplir la política pública dirigida hacia esta población, mediante los preceptos establecidos en esta Ley". *Íd.* Cónsono con lo anterior, el Estado les reconoce derechos a los adultos mayores, independientemente de aquellos señalados en otros ordenamientos legales, incluyendo:

**A.** *Generales, integridad, dignidad y preferencia:*

. . . .

**iii.** Recibir atención médica en su fase preventiva, clínica y de rehabilitación para la protección de su salud y su bienestar general.

. . . .

**xii.** Recibir protección y seguridad física y social contra abusos físicos, emocionales o presiones psicológicas por parte de cualquier persona.

. . . .

**xiv. No ser objeto de restricción involuntaria en un hospital, hogar sustituto o residencial a menos que exista una orden médica o legal que así lo disponga o que sea necesario por razón de mediar un estado de emergencia para evitar lesiones infligidas a sí mismo o a otros.**

. . . .

**xxi.** A una vida con calidad, libre y sin violencia o maltrato físico o mental, con la finalidad de asegurarle respeto a su integridad física, psicoemocional y sexual.
. . . .

**xxiii.** A recibir protección por parte de la familia y la sociedad, así como de las instituciones estatales y municipales.

**xxiv.** Vivir libre de presiones, coacciones y manipulaciones por parte de familiares, personas particulares, empresas privadas o del Estado, con el propósito de explotación financiera o que estén dirigidas a menoscabar su capacidad y su derecho a la autodeterminación.

**xxv.** Vivir en un ambiente de tranquilidad, respeto y dignidad que satisfaga las necesidades básicas de vivienda, de alimentación, de salud y económicas, con atención a sus condiciones físicas, mentales, sociales, espirituales y emocionales.

**xxvi.** A vivir en entornos seguros, dignos y protectores, que cumplan con sus necesidades y requerimientos y en donde ejerzan libremente sus derechos.

. . . .

**xxix.** A recibir la atención adecuada por las instituciones públicas y privadas y de la sociedad en general.

**B.** *Salud, alimentación y familia:*

**ii.** En el acceso a los servicios de salud, gozarán de calidad, conveniencia, paciencia y tolerancia en la atención en los diversos niveles del sector salud, desde una visión gerontológica.

. . . .

**iv.** A recibir una atención médica integral con calidad a través de acciones de prevención, diagnóstico, tratamiento y rehabilitación.

. . . .

**H.** *Establecimiento de Cuidado:*
i. Ser informado de antemano de todos los servicios que presta dicho establecimiento y el costo de estos.

. . . .

**vi.** No ser objeto de abuso corporal, emocional o presiones sicológicas y en caso de que ocurra el maltrato, cualquier persona facultada por ley tendrá potestad para remover al adulto mayor con su consentimiento. En aquellos casos donde el adulto mayor no esté capacitado para tomar decisiones o esté incapacitado mentalmente, mediante la autorización del tutor legal, si existiese, o una orden del tribunal.

. . . .

**viii.** No ser restringido física o químicamente ni aislado excepto por razones terapéuticas para evitar que la persona se cause daño a sí misma, a otros o a la propiedad. **En ninguna circunstancia se utilizará la restricción para castigar o disciplinar a una persona, así como tampoco se usará la restricción para conveniencia del personal del establecimiento. La restricción será usada únicamente mediante orden escrita de un médico. La orden debe detallar los datos, sus observaciones y la evidencia que dé base al uso de la restricción y a los propósitos para los cuales esta será usada. La orden deberá especificar, además, el término de tiempo de la restricción y la justificación clínica para dicho término de tiempo. Ninguna orden de restricción será válida por más de veinticuatro (24) horas. Si se requiere más restricción, se deberá expedir una nueva orden por el médico. La condición de la persona que ha sido**

**restringida o aislada deberá ser revisada cada quince (15) minutos, y dicha revisión se hará constar en el expediente clínico.**

Artículo 4 de la Ley Núm. 121-2019, *supra*, sec. 1514. (Subrayado y énfasis suplido).

Según se desprende del Artículo 7 de la Ley Núm. 121-2019, *supra*, sec. 1517, el Departamento de la Familia tiene el deber de tomar aquellas medidas de prevención y supervisión con el propósito de que la familia participe en la atención de los adultos mayores en una situación de riesgo o desamparo, en acuerdo de actuación con las dependencias gubernamentales. También ostenta la facultad para intervenir en todas las situaciones de maltrato, maltrato institucional, maltrato por negligencia y maltrato por negligencia institucional, donde se le refiera una situación de maltrato contra un adulto mayor; y será responsable de la prevención, identificación, investigación, supervisión protectora y tratamiento social de todo adulto mayor que sea víctima de maltrato en todas sus modalidades; y es el ente central en el en el aseguramiento del cumplimiento de la nueva legislación con el apoyo y cooperación de las agencias e instrumentalidades del Estado. Artículos 7-8 de la Ley Núm. 121-2019, *supra*, secs. 1517, 1518.

En atención a estas funciones y deberes del Departamento de la Familia, es meritorio definir institución, maltrato, maltrato institucional, maltrato por negligencia y maltrato por negligencia institucional. Una institución "es cualquier asilo, instituto, residencia, albergue, anexo, centro, hogar, fundación, casa, misión o refugio que se dedique al cuidado de tres (3) o más adultos mayores, durante las (24) horas del día, con o sin fines pecuniarios". Artículo 3 (13) de la Ley Núm. 121-2019, *supra*, sec. 1513. Por otra parte, el maltrato es aquel "trato cruel o negligente a un adulto mayor por parte de otra persona, que le cause daño o lo exponga al riesgo de sufrir daño a su salud, su bienestar o a sus bienes".

Artículo 3 (15) de la Ley Núm. 121-2019, *supra*, sec. 1513. El maltrato a los adultos mayores puede darse por acción u omisión, e incluye "abuso físico, emocional, financiero, negligencia, abandono, agresión, robo, apropiación ilegal, amenaza, fraude, violación de correspondencia, discrimen de edad, restricción de derechos civiles, explotación y abuso sexual, entre otros". *Íd.*

Cónsono con lo anterior, el maltrato institucional se define, en parte, como:

> [C]ualquier acto u omisión en el que incurre un operador de un hogar sustituto; cualquier empleado y/o funcionario de una institución pública o privada que ofrezca servicios de cuidado durante un día de veinticuatro (24) horas o parte de este, que cause daño o ponga en riesgo a un adulto mayor de sufrir daño a su salud e integridad.

> Artículo 3 (16) de la Ley Núm. 121-2019, *supra*, sec. 1513.

Además del maltrato institucional, también puede ocurrir negligencia institucional. La negligencia es "un tipo de maltrato que consiste en faltar a los deberes o dejar de ejercer las facultades de proveer adecuadamente los alimentos, ropa, albergue o atención médica a un adulto mayor". Artículo 3 (17) de la Ley Núm. 121-2019, *supra*, sec. 1513. En esa misma línea, la negligencia institucional es:

> [N]egligencia en que incurre un operador de un hogar sustituto o cualquier empleado o funcionario de una institución pública o privada que ofrezca servicios de cuidado durante un día de veinticuatro (24) horas o parte de este, que cause daño o ponga en riesgo a un adulto mayor de sufrir daño a su salud e integridad física, mental y/o emocional, incluyendo abuso sexual, conocido o que se sospeche, o que suceda como resultado de la política, prácticas y condiciones imperantes en la institución de que se trate.

> Artículo 3 (18) de la Ley Núm. 121-2019, *supra*, sec. 1513.

### D.

Tanto la Ley Núm. 94-1977, *supra*, como el Reglamento Núm. 7349-2007, *supra*, establecen los requisitos necesarios para obtener

y mantener una licencia por la cual se puedan operar establecimientos dedicados al cuidado de personas de edad avanzada en Puerto Rico, siendo estas personas con sesenta (60) años o más. Artículo 3 (7) de la Ley Núm. 94-1977, *supra*, sec. 353; Sección 3.13 del Reglamento Núm. 7349-2007*, supra*, pág. 3. Algunas de las condiciones impuestas a estos establecimientos para la concesión, renovación, suspensión, denegación o cancelación de licencias son la obtención de un Certificado de Capacitación para el Desarrollo de Competencias en el Cuidado de Personas de Edad Avanzada y mantenerse adiestrados por medio de cursos de educación continua. Artículo 7 de la Ley Núm. 94-1977, *supra*, sec. 357; véase, además, ***Viruet et al. v. SLG Casiano-Reyes***, 194 DPR 271, 281-283 (2015). Por su parte, el Departamento de la Familia deberá velar que estos establecimientos operen a tenor con las normas aplicables. Artículo 7 de la Ley Núm. 94-1977, *supra*, sec. 357; véase, además, ***Viruet et al. v. SLG Casiano-Reyes***, supra, pág. 283. De hecho, el Departamento de la Familia será quien único estará autorizado para expedir licencias a estos establecimientos y "lo hará tomando en consideración el bienestar de [e]st[as] [personas de edad avanzada]". Artículo 4 de la Ley Núm. 94-1977, *supra*, sec. 354.

A su vez, el Artículo 5 de dicho estatuto, *supra*, sec. 355, advierte sobre la prohibición de instituciones que operan sin sus debidas licencias solicitadas y concedidas. En ese extremo, habrá penalidades para aquellos establecimientos que no posean licencias expedidas por el Departamento de la Familia o que continúen operando cuando sus licencias han sido canceladas, suspendidas o denegadas, conforme al Artículo 13 de la Ley Núm. 94-1977, *supra*, sec. 363. Específicamente, en su inciso (b) establece que una vez el Departamento de la Familia notifique las deficiencias encontradas

durante la inspección, este departamento determinará los días para su corrección dependiendo del tipo de deficiencia y su severidad. Si se tratan de deficiencias en las áreas de seguridad, alimentación, higiene y medicamentos, las mismas deberán ser corregidas inmediatamente sin derecho a prórroga. *Íd*. De no corregir las deficiencias en el término establecido por el Departamento de la Familia, "el Departamento ordenará entonces la cancelación de la licencia y cierre permanente del establecimiento". *Íd*.

Por otro lado, la Sección 4.4. del Reglamento Núm. 7349-2007, *supra*, pág. 6, dispone expresamente que se le renovará la licencia a todo establecimiento que haya cumplido con todos los requisitos de acuerdo con el servicio ofrecido y que haya hecho entrega de la licencia vencida. La renovación de esa licencia será por un periodo de dos (2) años. *Íd*. No obstante, existen razones para la denegación, suspensión y cancelación de licencia. Sección 20.1 del Reglamento Núm. 7349-2007, *supra*, pág. 29. En lo pertinente al caso de marras, la Sección 20.1 (c-5) del Reglamento Núm. 7349-2007, *supra*, pág. 29, establece que se denegará la renovación de la licencia cuando el operador, administrador, director o encargado "[p]osea antecedentes de maltrato o negligencia en establecimientos de servicios a personas de edad avanzada o de niños(as)".

Otra de las razones para tal denegación es "[c]ualquier acto o intención por parte de cualquier personal del establecimiento que indique o incurra en negligencia o maltrato hacia la persona de edad avanzada". Sección 20.1 (d) del Reglamento Núm. 7349-2007, *supra*, pág. 29. En la Sección 21.1 (d) del Reglamento Núm. 7349-2007, *supra*, pág. 30, se establece el proceso requerido para notificar las deficiencias a los establecimientos:

> Las querellas de maltrato o negligencia podrán ser investigadas por el personal de la Administración de Familias y Niños (ADFAN), entiéndase la Unidad de Maltrato Institucional a Adultos. Cuando la Unidad de

Maltrato corrobore el maltrato y recomiende, medidas correctivas o cancelación, denegación o suspensión de licencia, la Oficina de Licenciamiento procederá a evaluar la recomendación de esa Unidad y tomará la acción según corresponde a Derecho.

En vista de ello, la notificación de la denegación, suspensión o cancelación de licencias será realizada por la Oficina de Licenciamiento del Departamento de la Familia "por correo, con acuse de recibo, a la dirección del establecimiento, según consta en el expediente de la Oficina de Licenciamiento, o personalmente por escrito en el establecimiento, señalando violación, según ley y reglamento", y la misma informará sobre el derecho a apelar. Sección 21.3 del Reglamento Núm. 7349-2007, *Íd.*, pág. 30. En ese extremo, los poseedores de licencias canceladas tendrán derecho a apelar la decisión ante la Junta Adjudicativa a los quince (15) días del recibo de esa notificación. Sección 21.4 del Reglamento Núm. 7349-2007, *Íd.*

### IV.

En el caso de marras debemos resolver si la Junta se equivocó al sostener que el Hogar incurrió en maltrato y si se utilizó la carga probatoria correspondiente para las determinaciones de hecho incorporadas en el *Informe Oficial Examinador Enmendado* del Oficial Examinador.

A juicio de la Junta, procedía confirmar la acción emitida por la UMIA de ADFAN, quien encontró "Con Fundamento" los referidos números 10343404, 10385988, 10386496 y 10387101, luego de realizar una investigación sobre alegado maltrato en el Hogar.

Cónsono con ello, el Departamento de la Familia denegó la solicitud de renovación de licencia presentada por el Hogar ante el incumplimiento con el Artículo 5 de la Ley Núm. 94-1977, *supra*, sec. 355; y con los incisos (c-5) y (d) del Artículo XX, Sección 20.1 del Reglamento Núm. 7349-2007, *supra*, pág. 29. Dicha denegatoria

implicó el cierre del establecimiento, conforme al Artículo 5 de la Ley Núm. 94-1977, *supra,* sec. 355.

Sin embargo, el TPI emitió una *Sentencia* el 8 de diciembre de 2022, en el caso PO2022CV02093 consolidado con PO2022CV01929, y concedió una *injunction* preliminar y permanente a favor del Hogar. De esta forma, el foro primario prohibió el cierre de dicho establecimiento y ordenó al Departamento de la Familia que impusiera supervisión constante y monitoreo sobre el Hogar para garantizar el cumplimiento con los estándares regulatorios aplicables al servicio allí brindado.

Una vez culminado el trámite administrativo, y en desacuerdo con la imputación de maltrato, el Hogar sostuvo que la parte recurrida incurrió en la comisión de cuatro (4) errores; a saber, la agencia administrativa no aplicó el estándar probatorio correcto; se equivocó al sostener conclusiones de maltrato sin que hubiese evidencia sustancial que las apoyara y cuando los señalamientos versaban sobre supuestas infracciones reglamentarias de licenciamiento; y las actuaciones de dicha agencia administrativa constituyeron actuaciones arbitrarias y caprichosas.

Tras un análisis objetivo, sereno y cuidadoso del voluminoso expediente, en correcta práctica adjudicativa apelativa, concluimos que no se cometieron los errores señalados y, por lo tanto, corresponde confirmar la determinación recurrida.

Según el primer señalamiento de error, el Departamento de la Familia aplicó el estándar de prueba aplicable incorrecto; a saber, la preponderancia de la prueba. El Hogar sostuvo que, a la luz de ***Oficina de Ética Gubernamental v. Martínez Giraud***, supra, y ***Oficina del Comisionado de Seguros v. Option Health Care Network, Inc.***, supra, aplicaba el estándar de prueba clara, robusta y convincente, pues existía la posibilidad de que la dueña del Hogar,

la señora Bermúdez Rivera, fuese privada de su sustento ante la privación de la licenciada del Hogar para operar una actividad regulada por el Estado. No le asiste razón.

Nuestro máximo foro reiteró en ***Oficina de Ética Gubernamental v. Martínez Giraud***, supra, pág. 93, que el *quantum* de prueba necesario para prevalecer en el <u>foro administrativo</u> es el de la preponderancia de la prueba. Sin embargo, cuando se trata de procedimientos administrativos sobre supuestas **violaciones a disposiciones éticas**, se debe aquilatar prueba desde una óptica más rigorosa y exigente que la preponderancia de la prueba. *Íd.*, 96. Específicamente, el estándar aplicable es el de prueba clara, robusta y convincente, y esto se estableció bajo el supuesto de que está en juego el derecho fundamental a ganarse un sustento. *Íd.* Del caso de la ***Oficina de Ética Gubernamental v. Martínez Giraud***, *Íd.*, págs. 96-97, se desprende que la controversia era de naturaleza acusatoria, pues el empleado público al cual se le imputó infringir una norma ética podía ser castigado con una multa sustancial o con su despido. *Íd.* Por lo tanto, el Tribunal Supremo concluyó que cuando "se cuestione el comportamiento ético de un funcionario público, así sea la simple apariencia de imparcialidad o deshonestidad, el cargo debe quedar establecido mediante prueba clara, robusta y convincente que, a su vez, supere y descarte todos los planteamientos basados en conjeturas y en relatos de terceros". *Íd.*, pág. 97. (Énfasis en el original eliminado).

En el caso de marras, no se desprende del expediente alegaciones sobre violaciones éticas por parte de un empleado público o cualquier otra persona. La controversia ante nos, no involucra violación a una disposición ética alguna, sino que versa sobre alegaciones de supuesto maltrato por parte del Hogar. Por lo tanto, tratándose de un procedimiento ante una agencia

administrativa, el estándar de prueba aplicable es el de la preponderancia de la prueba.

Con relación al segundo error señalado, el Hogar arguyó que el Departamento de la Familia, mediante la UMIA, incidió al convertir los señalamientos de licenciamiento por unos de maltrato. No le asiste la razón tampoco.

Como pormenorizamos anteriormente, la determinación de "Con Fundamento" relacionada al maltrato tiene un efecto en la concesión o denegatoria de una licencia. Para establecer, operar o sostener un establecimiento para el cuidado de personas de edad avanzada, es necesario solicitar y tener una licencia previo al inicio de sus operaciones. Artículo 5 de la Ley Núm. 94-1977, *supra*, sec. 355. El Departamento de la Familia es quien único está autorizado para expedir licencias a estos establecimientos y "lo hará tomando en consideración el bienestar de [e]st[as] [personas de edad avanzada]". Artículo 4 de la Ley Núm. 94-1977, *supra*, sec. 354. En esa misma línea, las licencias "serán expedidas por un período no mayor de dos (2) años, al cabo de lo cual podrán ser renovadas, si el establecimiento continúa cumpliendo con los requisitos establecidos por esta Ley, y los reglamentos promulgados al amparo de la misma". Artículo 7 (c) de la Ley Núm. 94-1977, *supra*, sec. 357. De ser renovadas, se expedirán por dos (2) años. *Íd.*

La Sección 4.4. del Reglamento Núm. 7349-2007, *supra*, pág. 6, dispone expresamente que se le renovará la licencia a todo establecimiento que haya cumplido con todos los requisitos de acuerdo con el servicio ofrecido y que haya hecho entrega de la licencia vencida. No obstante, existen razones para la denegación, suspensión y cancelación de licencia. Sección 20.1 del Reglamento Núm. 7349-2007, *supra*, pág. 29. En lo pertinente al caso de marras, la Sección 20.1 (c-5) del Reglamento Núm. 7349-2007, *Íd.*, establece

que se denegará la renovación de la licencia cuando el operador, administrador, director o encargado "[p]osea antecedentes de maltrato o negligencia en establecimientos de servicios a personas de edad avanzada o de niños(as)". Otra de las razones para tal denegación es "[c]ualquier acto o intención por parte de cualquier personal del establecimiento que indique o incurra en negligencia o maltrato hacia la persona de edad avanzada". Sección 20.1 (d), *Íd.* Por lo tanto, si el personal del establecimiento incurre en negligencia o maltrato respecto a un adulto mayor, el Departamento de la Familia denegará la solicitud de licencia y de no corregir las deficiencias señaladas por dicha agencia administrativa, esta ordenará la cancelación de la licencia y cierre permanente del establecimiento.

En el caso de epígrafe, si bien el Hogar presentó una solicitud de renovación de licencia para operar, unos informantes realizaron cuatro (4) referidos identificados con los números 10343404, 10385988, 10386496 y 10387101 ante la UMIA. Las alegaciones de dichos referidos tratan sobre unas serie de prácticas negligentes e ilegales en cuanto al cuidado de la población envejeciente del Hogar incluyendo menú vencido, cocinera y ayudante de cocina sin curso de inocuidad, comidas realizadas sin cumplir con el ciclo de menú, falta de higiene, registro de medicamentos sin actualizar, no administraban medicamentos sin contar con autorización médica, envejecientes fallecidos por falta de cuidados adecuados, caídas, uso de pecherines o cinturones sin orden médica, la muerte de una residente porque no la llevaron al hospital, entre otras alegaciones. Ante ello, la agencia administrativa realizó inspecciones oculares, examinó expedientes, y llevó a cabo entrevistas, pudo observar la situación de primera mano. Si bien una solicitud de licenciamiento se rige por la Ley Núm. 94-1977, *supra*, y el Reglamento Núm. 7349-

2007, *supra*; y la UMIA se rige por la Ley Núm. 121-2019, *supra*, y su reglamento, el propio Reglamento Núm. 7349-2007, *supra*, sobre licenciamiento dispone que si el operador, administrador, director o encargado posee antecedentes de maltrato o negligencia en un establecimiento de personas envejecientes, y o existe cualquier acto o intención por parte de cualquier personal del establecimiento que indique o incurra en negligencia o maltrato hacia la persona de edad avanzada, se denegará la solicitud de renovación de licencia para operar dicho establecimiento. En el caso de autos, como la agencia administrativa determinó que se demostró que el Hogar incurrió en maltrato institucional, el Departamento de la Familia no incidió al sostener conclusiones de la existencia de maltrato en el Hogar y denegar la renovación de la licencia para operar.

Por último, el Hogar argumenta que el Departamento de la Familia erró al sostener conclusiones de que hubo maltrato, sin evidencia sustancial para apoyarlas, y que las actuaciones de la agencia administrativa fueron arbitrarias y caprichosas. No tiene razón.

Surge palmariamente de la TPO que la supervisora de las cuidadoras y enfermera generalista, la señora Torres Soto, dejó de administrarle al envejeciente señor Mandry el medicamento de la presión sin autorización médica, cuando el señor Mandry es hipertenso y una de las funciones principales de la señora Torres Soto es brindarles a los pacientes tratamientos o medicamentos adecuados. Ella tampoco conocía las consecuencias de no brindarle el antipsicótico de Risperdone al señor Mandry cuando este medicamento sirve para atender la salud mental y la ansiedad. Consecuentemente, la señora Torres Soto tomó decisiones sobre la administración de medicamentos del señor Mandry <u>sin</u> autorización

médica sabiendo que no podía tomar dicha decisión y sin conocer el impacto que conlleva la omisión del antipsicótico.

Si ello fuera poco, la Directora de Operaciones y Administración del Hogar, la señora Negrón López, admitió que en una de las inspecciones realizadas por la UMIA, encontraron que al registro de medicamentos, que debe reflejar la hora y el medicamento suplido al paciente del Hogar, al igual que las razones para no administrarlo y la firma de cada cuidador o enfermero cuando entregaban las medicinas, le faltaban firmas. A esos efectos, la investigadora de la UMIA, la señora Alicea Rodríguez, también sostuvo que el Kardex no estaba iniciado en todas sus partes y la señora Torres Soto omitió administrar medicamentos prescritos por el médico, perjudicando la salud de los residentes del Hogar.

Respecto a las advertencias sobre el personal que cocinaba, la señora Negrón López testificó que personal que trabajaba ocasionalmente en labores relacionadas a la preparación y entrega de alimentos no contaban con el curso de inocuidad, contrario a la Sección 9.3 (d) del Reglamento 7349-2007, *supra*, pág. 15, el cual expresa que "[e]l personal de servicios de alimento presentará una certificación de aprobación del curso de manipulación de alimentos expedida por una Agencia certificada a tales propósitos".

En cuanto a la falta de personal, la señora Torres Hernández expresó que el Hogar incurrió en negligencia al no tener personal de a acuerdo a la tabla de proporción del Reglamento 7349-2007, *supra*, pág. 21. A esos efectos, la señora Alicea Rodríguez encontró que el Hogar no contaba con la cantidad de personal adecuada, según lo requiere el reglamento y la matrícula. Como ejemplo, explicó que tuvieron un (1) empleado por nueve (9) participantes cuando se supone que fuesen dos (2) empleados. Nótese que la *Tabla de Proporción de Personal de Servicio Directo por Turnos en las*

*Instituciones de Personas de Edad Avanzada* requiere dos empleados para el servicio directo a las personas de edad avanzada, cuando hayan de 7 a 10 personas de edad avanzada en los turnos de 6am a 2pm; 7am-3pm; 8am-4pm; 2pm-10pm; 3pm-11pm; y 4pm-12am. Sección 12.3 (d) del Reglamento 7349-2007, *supra*, pág. 21.

Por otro lado, la señora Alicea Rodríguez indicó haber entrevistado a unos empleados que ofrecieron información de múltiples caídas de los envejecientes. Ante lo anterior, ella confirmó cuatro de estas y determinó que las caídas ocurrieron por falta de supervisión del personal del Hogar.

Además, testificó la señora Torres Hernández que el punto clave para recomendar que no se renovara la licencia del Hogar fue el caso de la señora Luz Quiñones. De una lectura minuciosa del *Contrato de Servicios* fechado el 22 de agosto de 2016, y firmado por la señora Bermúdez Rivera y el hijo de la Sra. Quiñones, se desprende prístinamente de la primera cláusula que el Hogar se comprometió en proveerle servicios de cuidado a la señora Luz Quiñones con supervisión de 24 horas.[139]

Cónsono con esto, en su sexta cláusula, se dispone que "[s]e acuerda entre las partes que en caso de emergencia se moverá al envejeciente a la Sala de Emergencia del Hospital más cercano. El envejeciente se moverá en ambulancia y **EL REPRESENTANTE** asumirá los gastos de transportación o el deducible de MEDICARE".[140] También establece la séptima disposición que "[a]l ocurrir una emergencia en la cual se tenga que mover al envejeciente a una Sala de Emergencia, se notificará inmediatamente al **REPRESENTANTE** ya que **EL HOGAR** no está autorizado a firmar

---

[139] Apéndice del Alegato del Departamento de la Familia, Anejo V, pág. 7.
[140] *Íd.*, págs. 7-8.

documentos médicos legales autorizando servicios médicos".[141] Según la décima cláusula, "**EL HOGAR** se compromete a realizar la labor a la que se obliga en el presente Contrato de forma diligente y responsable".[142] A pesar del acuerdo entre el Hogar y el hijo de la señora Luz Quiñones, el Hogar no actuó de forma diligente y responsable al omitir trasladar a una paciente de 87 años, quien sufría de la enfermedad de Alzheimer, a sala de emergencias luego de varios incidentes médicos.

La señora Torres Hernández testificó que el caso de la señora Luz Quiñones trató de falta de atención médica, y:

> **Este... Este [sic] caso de Luz Quiñones fue lo que nosotros concluimos para fundamentar la... dar... la... dar la [sic] recomendación de no renovación de licencia porque el 7 de marzo, desde el 25 de octubre, pero, el 7 de marzo, de conocimiento propio, se orientó al personal del Hogar Las Águilas, en este caso, la [s]eñora Kammy Negrón que estaba allí, que tomara acción si un 'enve'... [sic] un adulto mayor requiere atención médica, que no esperara por familiares, porque aquí lo que estamos tratando es de darle la mejor calidad de vida y protegiendo. Cosa que no se hizo.[143]** (Énfasis suplido).

En otras palabras, aseguró la señora Torres Hernández que la muerte de la señora Luz Quiñones ocurrió en menos de 30 días de haber recibido la orientación de llevar a la paciente al hospital sin esperar por el familiar cuando el paciente requiere atención médica. Si ello fuera poco, del propio testimonio de la señora Negrón López surge que, cuando la señora Luz Quiñones muere, fue diligente en llamar al hijo de la fallecida, a la policía y al médico, conforme a la novena cláusula del contrato; a saber: "[e]n caso de fallecimiento del **REPRESENTADO**, **EL HOGAR** lo informará a su **REPRESENTANTE** y al **Cuartel de la Policía**. Esta a su vez notificará a fiscalía para el procedimiento de levantamiento del cadáver según establece la Ley.

---

[141] *Íd.*, pág. 8.
[142] *Íd.*
[143] TPO del del 20 de marzo de 2023, pág. 1,953, líneas 16-19 (Tomo VII); pág. 1,954, líneas 1-3.

Las pertenencias del envejeciente le será[n] entregadas a su **REPRESENTANTE**".[144] Sin embargo, incumplió crasamente con su deber de llevarla a emergencia, actuar de forma diligente y responsable, y brindarle un cuidado de 24 horas. Este incidente es un claro ejemplo de negligencia y maltrato institucional que desencadenó en la muerte de la envejeciente.

Por otra parte, la Ley Núm. 121-2019, *supra,* sec. 1514, dispone en su Artículo 4 que una persona no puede ser objeto de restricción involuntaria en un hospital, hogar sustituto o residencial al menos que haya una orden médica o legal o que incluso sea necesario por razón de mediar un estado de emergencia para evitar lesiones infligidas a sí mismo. Además, advierte que no se utilizará para conveniencia del personal del establecimiento y:

> **La orden debe detallar los datos, sus observaciones y la evidencia que dé base al uso de la restricción y a los propósitos para los cuales esta será usada. La orden deberá especificar, además, el término de tiempo de la restricción y la justificación clínica para dicho término de tiempo. <u>Ninguna orden de restricción será válida por más de veinticuatro (24) horas. Si se requiere más restricción, se deberá expedir una nueva orden por el médico. La condición de la persona que ha sido restringida o aislada deberá ser revisada cada quince (15) minutos, y dicha revisión se hará constar en el expediente clínico</u>.**
>
> Artículo 4 (viii) de la Ley Núm. 121-2019, *supra,* sec. 1514. (Subrayado y énfasis suplido).

Por lo tanto, utilizar pecherines para darle alimentos a personas con Alzheimer no está prohibido empero requiere una orden médica o legal, tal como determinó la agencia administrativa.

Por último, según pormenorizado precedentemente, el maltrato es aquel "trato cruel o negligente a un adulto mayor por parte de otra persona, que le cause daño o lo exponga al riesgo de sufrir daño a su salud, su bienestar o a sus bienes", y puede darse

---

[144] Apéndice del Alegato del Departamento de la Familia, Anejo V, pág. 8.

por negligencia. Artículo 3 (15) de la Ley Núm. 121-2019, *supra*, sec. 1513. Asimismo, constituye maltrato institucional, cualquier acto u omisión en el que incurre un operador de un hogar sustituto, cualquier empleado y/o funcionario de una institución pública o privada que ofrezca servicios de cuidado durante un día de veinticuatro (24) horas o parte de este, si causa daño o pone en riesgo a un adulto mayor de sufrir daño a su salud e integridad. Artículo 3 (16) de la Ley Núm. 121-2019, *supra*, sec. 1513.

De igual modo, la negligencia es un tipo de maltrato que consiste en faltar a los deberes o dejar de ejercer facultades de proveer atención médica a un adulto entre otros. Artículo 3 (17) de la Ley Núm. 121-2019, *supra*, sec. 1513. Un hogar sustituto o empleado de una institución pública o privada incurre en negligencia cuando causa daño o pone en riesgo a un adulto mayor de sufrir daño a su salud e integridad física, mental y/o emocional. Artículo 3 (18) de la Ley Núm. 121-2019, *supra*, sec. 1513.

Omitirle medicamentos al señor Mandry, no brindarle atención médica y utilizar pecherines sin órdenes médicas o legales, unidos a los otros hallazgos, son claras instancias de negligencia y maltrato institucional.

A tenor con el voluminoso legajo que constituyen los autos de este caso, resulta imperativo concluir que la Junta Adjudicativa no cometió los errores señalados por la parte recurrente, que el dictamen es correcto en derecho y, por lo tanto, corresponde la confirmación de la determinación de la parte recurrida.

**V.**

Por los fundamentos pormenorizados anteriormente, se *confirma* la *Resolución* recurrida.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones